## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Jeremy D. Orchin, Trustee of the Eugene C. )
Gadaire Insurance Trust )
  )
Plaintiff )
  )
v. )     Case No. 1:12-cv-1743-BAH
  )
Great-West Life & Annuity Insurance Company )
  )
Defendant )
_____ )
  )
Elizabeth Gadaire )
  )
Plaintiff )
  )
v. )     Case No. 1:13-cv-00055
  )     (consolidated with above)
Jeremy D. Orchin, et al. )
  )
Defendants, et al )
_____ )

## DEFENDANT GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Great-West Life & Annuity Insurance Company ("Great-West"), through counsel, submits this memorandum of points and authorities in support of its Motion for Summary Judgment filed pursuant to Fed.R.Civ.P. 56 and Local Rule 7.

### I. Introduction

In his capacity as Trustee of the Eugene C. Gadaire Insurance Trust, Jeremy Orchin ("Orchin") seeks $750,000 in term life insurance benefits from Great-West under an individual certificate that insured the life of Eugene Gadaire ("Dr. Gadaire"), issued to Dr. Gadaire through a non-ERISA group life insurance plan established by the American Dental Association ("ADA"). By way of an assignment from Dr. Gadaire, Orchin was the designated owner of the

1

certificate and the trust was the designated beneficiary. Following Orchin's presentation of a benefit claim after Dr. Gadaire's death, Great-West denied payment after learning that Orchin had provided false information to Great-West when it gratuitously approved his request to reinstate the coverage which had terminated after he failed to pay the semi-annual premium.

In the consolidated case, Elizabeth Gadaire ("Gadaire"), Dr. Gadaire's spouse and trust beneficiary, seeks the proceeds from Great-West and has claimed against Orchin for allowing the termination. Orchin's Amended Complaint ("AC") alleges five claims and Gadaire's AC alleges eight. All five of Orchin's claims are against Great-West, as are Gadaire's first five. Great-West's motion is directed at these five claims which are essentially the same.[1]

## II. Undisputed Facts

Dr. Gadaire had $750,000 in term life insurance under the ADA group term life plan and to accomplish his estate planning objectives he assigned his ownership rights in his certificate to Trustee Orchin in June of 1993.[2] The assignment stated in part:

ABSOLUTE ASSIGNMENT OF ALL INCIDENTS OF OWNERSHIP

\*\*\*

I, Eugene C. Gadaire without valuable consideration, hereby give, assign, transfer and set over unto Jeremy D. Orchin, as Trustee of the Eugene C. Gadaire Insurance Trust, under Agreement dated April 5, 1993 [address] and the successors, administrators or assigns of said assignee the insurance on my life provided under the certificate under the above group policy together with all incidents of ownership therein and all my right, title, claim, interest and benefit in and to all moneys which are or may at any time become payable thereunder or in connection therewith, with full power to the assignee to receive same and grant receipts therefor which shall effectively discharge

---

[1] Since Orchin filed the first suit and was the contractual beneficiary when the insurance was in place, Great-West addresses his claims first and more specifically.

[2] Orchin and Dr. Gadaire set up similar trusts in 1993 with each serving as trustee for the other. Exhibit. 1, Jeremy Orchin's Deposition Transcript, p. 9, line 6 through p. 11, line 14. Orchin also used a certificate issued under the ADA group plan to fund his trust. *Id.*, p. 65, lines 9-21. They let Orchin's terminate when it was decided the insurance was no longer needed, and he does not recall if anyone told Great-West or if they simply let his certificate terminate for non-payment. *Id.*, p. 65, line 22 through p. 66, line 6, and p. 98, line 19 through p. 99, line 8. *See also* fn. 10 below, clarifying termination of Orchin's insurance in 1999 rather than 2004 as he testified.

Great-West Life & Annuity Insurance Company and exonerate it from seeing to or being accountable for the application of the moneys therein acknowledged to have been received and with full power of the assignee at any time to exercise all rights, options and privileges given to or at any time exercisable by the insured under the said policy in respect to the insured's interest under the above certificate.

Exhibit. 2, GRTWST 108.[3] Semi-annual premiums were due every January and July 1st.

Orchin's AC, ¶ 25. Regarding premiums, the certificate stated in part:

**<u>Payment</u>**

… Premiums are payable by the insured Member to the Company at the Company's Executive Offices. Any premium not paid on time will be in default.

\*\*\*

**<u>Grace Period</u>**

After the first premium has been paid, 31 days are allowed to pay a premium in default. During this time, the insured Member's insurance will remain inforce unless the insured Member requests in writing to terminate the coverage. If the premium is not paid by the end of the days of grace, the insured Member's insurance will terminate.

**<u>Acceptance of Premiums in Default</u>**

The Company, at its sole discretion, may, but is not required to, accept a premium that is in default or extend the time for a premium to be paid. The Company's decision to accept a late premium, or extend the time for a premium payment, if any, shall not be construed as a continuing waiver of the right to enforce the premium payment terms and conditions set forth in the individual Certificate.

Exhibit 3, The Individual Certificate 9330 at GRTWST 10 (bolding of defined terms omitted here and subsequently). Under the heading "WHEN INSURANCE ENDS," the certificate stated in part:

The insurance of an insured Member will end on the earliest of the following:

\*\*\*

3) the 32nd day after the due date of any unpaid premium…

---

[3] Exhibit 2 contains various documents from Great-West's numbered disclosures arranged sequentially. The assignment was executed in conjunction with a document that appointed Orchin in his capacity as trustee as the beneficiary of the certificate's life insurance benefits. Exh. 2, GRTWST 106. Both the change of beneficiary and assignment were recorded by Great-West on June 25, 1993. *Id.*, 106 and 108.

*Id.* at GRTWST 17. From 1993 through January 1, 2009, Orchin paid the premium notices sent to him at the address listed on the assignment. However, the notice for the premium due on July 1, 2009, generated by Great-West's administration system in early June 2009, went unpaid, causing the contractual grace period to commence and thereafter expire as of August 1, 2009. Exhibit 4, Ms. Gina Goodreau's Declaration, ¶¶ 4-6. A copy of the notice sent to Orchin is appended as Exhibit 5.

Great-West's administration system monitors accounts within a couple of business days of the end of the grace period to determine those that terminated for non-payment. Soon thereafter, a standard lapse/reinstatement notice is sent to all terminated certificate owners that offers them a new period of 31 days from the end of the grace period to pay the defaulted premium and reinstate the insurance. Exh. 4, Goodreau Decl., ¶ 6. The notice sent to Orchin stated in part:

> Your insurance terminated on August 01, 2009 for nonpayment of the premium due July 01, 2009. Please see offer of reinstatement.
>
> ***
>
> OFFER OF REINSTATEMENT
>
> Your ADA Group Life Insurance has been terminated due to non-receipt of the premium amount due within the thirty-one day grace period. Coverage will be reinstated without evidence of insurability if you are living when your remittance is received by [Great-West] within thirty-one days from the date your insurance terminated.
>
> You must be a member in good standing of the [ADA or student division of the ADA] on the due date in order to continue your insurance.
> ***
> By paying your renewal premium, you are attesting that you meet the eligibility requirements to continue your insurance under this Plan.

Exhibit 6, Lapse/Reinstatement Notice, GRTWST 452-53. Since most certificate owners who allow insurance to terminate do not notify Great-West of their plans, Great-West does not send anything else to owners of terminated certificates, and nothing else was sent to Orchin. Exh. 4, Goodreau Decl., ¶ 7.

Early on the morning of January 18, 2010, Great-West representative Jan Guthrie received an automatically-recorded call from Orchin, transcribed in full as follows:

**January 18, 2010 7:05 a.m.  Jeremy Orchin to Jan Guthrie [all times MST]:**

**Jan Guthrie**: Good morning, Great-West Life, this is Jan how can I help you?

**Jeremy Orchin**: Hi Jan, thank you very much, my name is Jeremy Orchin. I'm the trustee of a life insurance trust for a friend of mine and I think I need to clear up a discrepancy in billing. I haven't gotten a statement for the balance that was due in December. I think I've moved several times and I've put in a change of address but I'm not sure it's gotten through so I need some help to clarify this.

**JG**: Okay, I can certainly help you with that, what's the certificate number?

**JO**: The certificate number is 91130.

**JG**: Okay. Alright and the insured's name?

**JO**: Eugene Gadaire, G-A-D-A-I-R-E.

**JG**: Okay, now for privacy protection I do need to ask you a couple of security questions here.

**JO**: Sure.

[Guthrie asked Orchin for Dr. Gadaire's date of birth and dental school, Orchin provided]

**JG**: Okay. Thank you. You know, unfortunately this policy terminated July 1, 2009 because we did not receive payment. The address that we have on the system 2831 44th Street, NW.

**JO**: Yeah, that's, we moved. I thought there was an issue. I need to clear this up because I knew that I didn't get one in December.

**JG**: Okay.

**JO**: I need to, I'm the trustee, and I need to reinstate the policy because there was a miscommunication on addresses. Would anything have been sent out?

**JG**: Well…

**JO**: Because I didn't get anything.

**JG**: Okay, a bill would have been sent out in June for the July 1 renewal, and then since we did not receive payment within that 31 day grace period, by the end of July, a lapse notice would have been sent out.

**JO**: I did not receive any notices, that's my issue.

**JG**: *Okay, did you send us or give us a call to change the address?*

**JO**: *No, I'm afraid that I neglected to do that because of my, it was two moves in six months and it was my fault and I need to know what I can do to reinstate this. I'm under a lot of pressure because I'm the trustee.*

**JG**: Yes and I understand that. The only thing to get it, the only way to get his coverage back would be for him to submit an application and it's basically, he would have to re-apply. They would take a look at how he answers all the questions to determine whether he needs to go through the underwriting process. But chances are he probably will because it's been more than six months past the renewal of the last renewal. So what I can do is send you or give you our website and application. You can download the application and turn it over to him so that we can get this back in force for him but it is going to be a process.

5

**JO**: *Is there someone else I can talk to that might have more influence because I'm feeling so guilty, I've been a trustee for 15 years and I've never let it slip and I don't want [him or them-parties disagree] to know that I did this. There must be a way that I can pay back the past monies or something.*

**JG**: Unfortunately, this is the only way, I'm so sorry. It's been more than six months so this would be the only way to get the coverage back is for him to go through this process again.

**JO**: I can't, ay ay ay, I'm put in such a difficult situation because they have trusted me for so long. Is there some, there must be something, is there someone else that I can talk to that might be able to help me out, a supervisor or something. I understand you are helping as much as you can.

**JG**: Yes there is a supervisor here but they are going to be telling you exactly the same thing. You know, we are just real firm on this type of situation. I can appreciate your feelings and where you are coming from but this would be the only way to go ahead and get that coverage back for him.

**JO**: Ay ay ay, you're telling me if I talk to somebody else it's not going to make a difference. I would like to talk to somebody else just for my own well-being. Is that appropriate?

**JG**: I can see if there is anyone available. Hold on just a minute please.

**JO**: Okay, thank you.

Exhibit 7, Stipulated Transcript of Calls with Great-West, p. 1-3 (emph. added).[4] The manager with authority, Rochelle DeMills, was not in but since Orchin asked for a manager, Guthrie sought out Nancy Fix. After they exchanged some information Guthrie transferred Orchin to Fix. The transfer and Orchin's call with Fix follow:

**January 18, 2010 7:12 a.m. Jan Guthrie to Nancy Fix**
**Nancy Fix**: Hi.
**Jan Guthrie**: Okay.
**N**: You have the certificate number?
**J**: Yes, Term Life Number 91130.
**N**: Okay
**J**: And the person that's calling Jeremy Orchin. He's the trustee.
**N**: Orchin?
**J**: Orchin.
**N**: Okay

---

[4] Orchin's deposition confirms he never made an address change and did not recall communicating with Great-West, he simply paid premiums after receiving all prior notices. Exh. 1, p. 16, lines 10-14. His "two moves in six months" comment implied that one or both occurred between when he paid the last premium due January 1, 2009, and the defaulted one due July 1, 2009, but that is inaccurate. His first move was in late 2007 and the next in June 2008, so after two moves he did receive the January 2009 premium notice sent to the only address known to Great-West before January 2010. *Id.*, p. 20, line 22 through p. 22, line 9.

**J**:  And yeah and so he's feeling pretty bad and guilty.
**N**: Uh-oh
**J**: Yeah
**N**:  Okay.
**J**:  Thanks Nancy.
**N**:  Thank you.


**January 18, 2010 at 7:12 a.m. Jeremy Orchin to Nancy Fix    (Transfer)**
**Nancy Fix**:  Hi Mr. Orchin?
**Jeremy Orchin**: Yes.
**N**: Hi, this is Nancy.
**J**: Thanks for picking up the phone Nancy.  I am in a terrible fix.
**N**:  Okay.
**J**:  I have been the trustee of his life insurance for 20 years and paying it every six months on time.
**N**:  mm-hmm.
**J**:   Over the last year I've moved twice, one of which was in May.  It seems to me unbeknownst to me because of everything else that I did not receive a notice of payment for his premium.
**N**:  Okay.
**J**:  Now I'm settled in my new house I realize I didn't get one for December not knowing I didn't get one for July.
**N**: Right.
**J**:  And if we look back I've paid everything on time and I'm the trustee of this estate and I just can't have it, let it lapse, I'm wondering if there is some way I can just pay back, I mean if there is a penalty or whatever to reinstate the existing conditions.  *I don't want them to know that I …*
**N**:   Right, I understand.  Let me do this.  We normally can have you fill out a re-application within six months of when the policy lapsed but it's been more than that so I have to get like a manager, a higher manager to approve this.  Is there a phone number where I can give you a call back?
**J**: Yeah you bet, will it be today?
**N**: Yes, Mm-hmm.
    [Orchin gave number to Fix]
**N**. Okay it's 7:15 here and the other manager doesn't even come in until about 9:30.  So it will be probably 3 or 4 hours before we could have any kind of an answer but we'll certainly look at this and see what we can do.
**J**:  Yeah, again if you look back at the past history it's never been late or missed and it was just an inadvertent moving of my part and the post office not sending it.
**N**:  Sure.
**J**:  I'm just so upset I can't believe it.
**N**:  I understand, I do.  Let me see what we can do. I'll give you a call back, you know, sometime today regardless of what we find out. Okay.
**J**: Okay thanks so much.
**N**: Alright thank you.
**J**: Bye.

Exh. 7 at 3-5 (emph. added). Fix had no authority regarding terminated coverage, so she brought the issue to the attention of Rochelle DeMills when DeMills arrived. Exhibit 8, Ms. Rochelle's DeMills Declaration, ¶ 3.

Although the certificate places no limits on how or when Great-West exercises its discretion regarding acceptance of post-termination premiums in default, Great-West endeavors to handle reinstatements of terminated insurance on a generally consistent basis. Exh. 4, Goodreau Decl., ¶¶ 6-8. After discussing the topic with her supervisor, DeMills had previously created an email/memo in 2007 sent to employees under her direction that explained the issues. Exh. 2, GRTWST 668-69. One of the first things Great-West does when someone claims a premium or other notice was not received is investigate whether there were any problems with the sending of notices, such as an incorrectly recorded address change. Exh. 4, Goodreau Decl., ¶ 8. DeMills investigated Orchin's claims and found no problems on Great-West's end with the sending of either the June 2009 premium notice or the lapse/reinstatement notice, and neither had been returned. Exh. 8, DeMills Decl., ¶ 4.

DeMills' research revealed that Dr. Gadaire had applied for new life insurance in 2007 to fund a buy-sell agreement with his partner, Dr. Mark Tromblay. Exh. 2, GRTWST 529-536.[5] His application had been denied due to health history that disqualified him for new insurance with Great-West. Exh. 8, DeMills Decl., ¶ 5. She knew that if Great-West followed its usual procedure and required him to apply for new insurance, he would be denied and foreclosed for ADA plan insurance due to Orchin's actions. *Id.* Therefore, she decided to allow reinstatement without requiring Dr. Gadaire to apply for new insurance provided the premiums were paid. She

---

[5] Partner dentists often enter into "buy-sell" agreements with each the beneficiary of life insurance on the other's life so if one dies, the survivor can buy out the deceased's interest. Exh. 4, Goodreau Decl., ¶ 9.

had Fix respond to Orchin, clarifying that this exception to the typical procedure would not be

repeated. *Id*. Fix left Orchin a message and he quickly responded:

**January 18, 2010 12:45 p.m. Nancy Fix to Jeremy Orchin**
Voicemail recording: ….voicemail of Jerry Orchin Please leave your name and number and I'll get back to you as soon as I can.

**Nancy Fix**: Hi Mr. Orchin, it's Nancy from Great West Life. We spoke this morning regarding the doctor's term life coverage lapse, Dr. Gadaire. We are going to make a one-time exception just because this isn't, you know, the doctor's doing and I am going to send out a bill. I was hoping that maybe I could get your e-mail address and send you a letter that kinda has to go along with this billing. I will be out of the office tomorrow so if you can possibly get back to me I'll be here for about another 45 minutes or this afternoon. Let me give you my direct number. It's 303-737-5172. I'll go ahead and prepare the form now and if you could get me an e-mail address or fax number or something that I can fax this letter to you along with the billing then we can get this reinstated as quickly as possible. Thank you. Bye.

**January 18, 2010 12:50 p.m. Jeremy Orchin to Nancy Fix**
**Nancy Fix**: Good afternoon, this is Nancy.
**Jeremy Orchin**: Hi, Nancy, Dr. Orchin returning your call.
**NF**: Hi there.
**JO**: Hi I got your message, sorry I just couldn't get to the phone.
**NF**: No that okay, that's no problem at all.
**JO**: I got your message. Thank you for making this one time exception
**NF**: Your welcome
**JO**: I definitely appreciate. So let me give you my e-mail address.
**NF**: Perfect.
**JO**: And I can just send you a check or what do I have to do?
**NF**: Actually once I get this reinstate you can even pay it with a credit card online if you want to.
**JO**: Yeah I'll pay it with a credit card online.
**NF**: Wonderful. Okay, I will, what I'll do is send you a link to go in and directly pay it with a credit card
**JO**: Okay terrific
**NF**: Okay and then once that's paid it will go right back in force
**JO**: Thank you Nancy I appreciate it.
**NF**: No problem
**JO**: My e-mail is drorchin@gmail.com
**NF**: I'm sorry drorchin…
**JO**: I-N,
**NF**: Okay
**JO**: I-N as in Nancy.
**NF**: Okay.
**JO**: @gmail.com.
**NF**: Gmail, okay.

**JO**: So with that you'll send me the instructions for paying it online?
**NF**:  Yes I will and I'll enclose a copy of the billing also, I'm just typing the letter up right now for you.
**JO**:  Okay.
**NF**: Okay?
**JO**:  You're doing this right now before you leave today?
**NF**:  Yes I will.
**JO**:  Terrific, thanks so much Nancy.
**NF**: You're very welcome.  Have a good day.
**JO**:  You bet. Bye -bye.
**NF**:  Thank you. Bye.

Exh. 7 at 5-7.  A confirming email letter Fix sent to Orchin stated in relevant part:

> We have agreed to make a one time exception and reinstate Dr Gadaire's Term Life coverage under Certificate # 91130. This exception is not to set precedence, and we will require evidence of insurability with full medical underwriting if the policy lapses for non payment of future premiums. Since this is a reinstatement, premium is being charged back to 7/1/2009 when this coverage lapsed.

Exhibit 9, January 18, 2010 correspondence from Ms. Fix to Orchin.  Great-West negotiated Orchin's payment of the back premiums received a few days later.  Exh. 2, GRTWST 493; Exh. 4, Goodreau Decl., ¶ 11.

On February 2, 2010, Great-West received a call from Dr. Tromblay.  He mistakenly thought Dr. Gadaire's 2007 application to fund their buy-sell agreement had been approved and reported Dr. Gadaire's death.   Exh. 7 at 10-14.  His inquiries generated a claim form sent to Orchin's new address.  *Id*.; Exh. 4, Goodreau Decl., ¶ 4.  Orchin's claim, received on February 26, 2010, revealed that Dr. Gadaire had died while the insurance was terminated, *three days before* Orchin called to report the "missed payments due to moves" problem.  Exh. 2, GRTWST 496.  Great-West's employees would not have reinstated the insurance if they had known the insurable event had already occurred.  Exh. 4, Goodreau Decl., ¶ 12; Exh. 8, DeMills Decl., ¶ 6; Exhibit 10, Ms. Jan Guthrie's Declaration, ¶ 4; Exhibit 11, Ms. Nancy Fix's Declaration, ¶ 6.

After a full review, Great-West's Senior Manager, Gina Goodreau, issued a claim denial and premium refund on March 19, 2010. Exh. 2, GRTWST 328-329; Exh. 4, Goodreau Decl., ¶ 15.

Orchin retained counsel and raised multiple appeals which were denied. He also presented consumer complaints to the Virginia and Illinois Insurance Departments. Neither agency took action after receiving Great-West's response. Exh. 4, Goodreau Decl., ¶¶ 16-20.

### III. Legal Analysis

The five claims, all pleaded as breaches of contract, try to sidestep what happened on January 18, 2010. The first and fourth claims revisit the insurance termination and assert that District of Columbia law required "cancellation" notices to others besides Orchin. The third and fifth claims also focus on termination, implying things would have been different if Dr. Gadaire had been copied with premium notices, and try to retroactively impose that "duty" on Great-West with language from the certificate and separately from the trust document. The final second claim, merely alleging a failure to pay, is the logical place to address things Great-West allegedly should have done differently to protect itself from Orchin, and a suggested failure to send him the defaulted-upon premium and lapse/reinstatement notices. All claims are defective.

### A. Summary Judgment Standards

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A properly supported motion shifts the burden to the opposing party to show with evidence in admissible form that a material fact issue exists. Fed.R.Civ.P. 56(c)(1). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matshshita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986). Summary judgment is an integral part of the Federal Rules designed to secure the just, speedy and inexpensive determination of appropriate cases. *Celotex Corp.*, 477 U.S. at 327.

Since construction of an insurance contract presents a matter of law for determination by a court, summary judgment is particularly appropriate to the extent it involves contract interpretation when, as here, no material facts are in dispute. *T.H.E. Ins. Co. v. City of Alton*, 227 F.3d 802, 805 (7th Cir. 2000) ("Under Illinois law, construction of an insurance contract is a question of law, suitable for disposition by a court on a motion for summary judgment."). Even factual issues are properly resolved by summary judgment when the inferences to be drawn from undisputed facts permit only a single conclusion for a reasonable factfinder. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009); *York v. McHugh*, 850 F.Supp.2d 305, 309-10 (D.D.C. 2012).

## B. Illinois law governs

Under the heading "Governing Law and Conformity with Statutes" the certificate stated:

> At the request of the Association, which is headquartered in Chicago, Illinois, and with the agreement of the Company, the Policy and any dispute between an insured person or claimant and the Company arising in connection therewith are subject to, governed by, and shall be construed in accordance with the law of the State of Illinois, and this Policy has accordingly been submitted to and approved by the Illinois Department of Insurance.

> The Policy is sitused in the State of Illinois, and is amended to comply at all times with the minimum requirements of the State of Illinois, which apply to Group Term Life Insurance.

> The Policy and individual Certificates issued are deemed to be issued in the State of Illinois.

Exh. 3 at GRTWST 24. Orchin admitted in ¶ 53 of his AC that this applies, but stated in ¶ 54 that the contract is to be "construed in accordance with both the law of the State of Illinois and the law of the District of Columbia, and when in conflict or when provisions permitted under

Illinois law are prohibited under the law of the District of Columbia, the law of the District of Columbia should prevail and govern." Gadaire pleaded similarly in ¶¶ 39-40 of her AC.

Orchin and Gadaire appropriately concede enforceability of the choice of law provision. "Under District of Columbia law such clauses govern as long as there is some reasonable relationship with the state specified." *Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011) (addressing association-sponsored group health insurance; internal quotations and citation omitted); *see also King v. Liberty Life Assurance Co. of Boston*, 806 F.Supp.2d 25, 29 (D.D.C. 2011) (following *Whiting* and stating that contractual choice of law provisions are enforced when applicability conceded). The required connection of "some reasonable relationship with the state specified" is easily met here since the plan's sponsor, the ADA, is headquartered in Illinois as confirmed by the provision and by ¶10 of Orchin's AC. S*ee also* Gadaire's AC, ¶ 7.

Orchin and Gadaire's pleadings point to differences between Illinois and District of Columbia law, and particularly whether, with regard to certain types of policies, non-owner insureds and an insurance commissioner need to be copied with cancellation notices which they insist District of Columbia law requires. Orchin's AC, ¶¶ 60, 76; Gadaire's AC, ¶¶ 44, 58. The parties agree that Illinois and District of Columbia law differences create a true conflict. [6]

---

[6] Group insurance policies in general present uniformity of administration issues even in the absence of a choice of law provision, and group policyholders have considerable bargaining power along with their authority to make agreements that bind members of the group who avail themselves of the policy benefits:

In the case of group life insurance, rights against the insurer are usually governed by the law which governs the master policy. This is because it is desirable that each individual insured should enjoy the same privileges and protection. So where an employer arranges for group life insurance for its employees, the rights of a particular employee against the insurer will usually be determined, in the absence of an effective choice-of-law clause and at least as to most issues, not by the local law of the state where the employee was domiciled and received his certificate but rather by the law governing the master policy with respect to that issue. This will usually be the state where the employer has his principal place of business.

Choice-of-law provisions contained in group life insurance policies are more likely to be given effect than in the case of ordinary life insurance. This is because the organization or individual

Orchin and Gadaire violate choice of law analysis by asserting that the laws of "both" Illinois and the District of Columbia apply, and the notion that in the event of conflict between those laws, then District of Columbia law, their preference, "trumps" Illinois law. They admit the certificate's chosen law applies and simultaneously limit it to when it does not matter.

Differences between a chosen jurisdiction's laws and a forum jurisdiction's laws are a given. When the question of the law governing contract or tort claims is decided without a contractual provision, a difference between the laws of competing jurisdictions is necessary or else there is no "conflict" of laws and courts apply the law of the forum jurisdiction with which they are likely more familiar. *See Queen v. Schultz*, 888 F.Supp.2d 145, 157 (D.D.C. 2012). Applying the law of a "reasonably" contractually chosen jurisdiction, as *Whiting* requires, does not mean the chosen law applies only when it is consistent with the forum jurisdiction's laws.

There is no "scope" question concerning the choice of law provision presented, i.e., the extent to which it applies to contract as well as related tort claims, because all claims against Great-West are breach of contract claims. *See generally, Minbea Co., LTD v. Papst*, 377 F.Supp.2d 34, 38 (D.D.C. 2005). The language covers "any dispute" between a claimant and Great-West "arising in connection" with the group policy and thus Illinois law governs all possible claims regardless of how denominated. *See Cooper v. Meridian Yachts, LTD*., 575 F.3d 1151, 1162 (11th Cir. 2009) (finding similar "all disputes" language applicable to tort claims).

---

which procures the master policy will usually have a stronger bargaining position than an individual insured with the result that the choice-of-law provision is less likely to have a "take-it-or-leave-it" character.

RESTATEMENT (Second) CONFLICT OF LAWS, §192, comment (h). Enforcement of a choice of law provision in a group policy is especially appropriate when, as here, the chosen state's law is also the law of the group policyholder. "The prevailing view is that a choice of law made in the basic group policy will be honored by the courts, particularly where that selection is the State of the group policyholder." *Hofeld v. Nationwide Life Ins. Co.,* 59 Ill.2d 522, 530, 322 N.E. 2d 454, 460 (1975).

The broad language forecloses debate, and Illinois law governs all claims, remedies, and substantive aspects of this case.  *See Boston Mut. Life Ins. Co. v. Ludwig*, 2007 WL 1448708, *4 (E.D. Va. 2007) (collecting cases); *Silvest v. Monumental Gen. Ins. Co*., 1993 WL 262012 *5 (7th Cir. 1993) ("Because the policy is governed by the substantive law of the District of Columbia, the Guardian cannot seek relief under the Illinois Insurance Code."); *Oakton Distributors, Inc. v. U-Line Corp*., 2006 WL 2714695 *3 (N.D. Ill. 2006) ("[T]he Court finds that the choice-of-law provision in the [contracts] should be respected. And, if Wisconsin law applies, the Illinois Franchise Disclosure Act…would play no role.").  Orchin and Gadaire cannot read into the contract any District of Columbia statutory, regulatory or common laws.

**C. The First And Fourth Claims Based Upon District Of Columbia Law Are Precluded**

Orchin's and Gadaire's first claim for relief invokes §31-4712(c)(2)(H) of the District of Columbia Insurance Code, applicable to certain kinds of policies, requiring notice to an insured for cancellation to be effective.  Orchin's AC, ¶¶ 50-62; Gadaire's AC, ¶¶ 41-47.  Their fourth claim invokes District of Columbia municipal regulations which govern certain kinds of policies and they claim provisions thereof, mainly § 26-A301.2-5, require notice of cancellation to an insured and to the District's Insurance Commissioner for cancellation to be effective. Orchin's AC, ¶¶ 73-79; Gadaire's AC, ¶¶ 58-63.[7]  These claims for relief are precluded by Illinois law.

**D.  The Attorney's Fees Requests Are Precluded By Illinois Law**

In this first-party dispute between insurance claimants and an insurer, the remedy codified in 215 ILCS 5/155, which includes an attorney's fees provision, "… is the 'legislature's remedy to an insured who encounters unnecessary difficulties when an insurer withholds policy benefits.'" *Sieron v. Hanover Fire and Cas. Ins. Co.,* 485 F.Supp.2d 954, 959-960 (S.D. Ill. 2007), quoting

---

[7] The fourth claims unnecessarily mention notice to an agent/broker, inapplicable to this group insurance.

*Golden Rule Ins. Co. v. Schwartz,* 203 Ill.2d 456, 272 Ill. Dec., 176, 786 N.E.2d 1010, 1018 (2003). Section 5/155 is "the exclusive remedy for an insurer's bad faith denial of benefits." *Menotti v. Met. Life Ins. Co.,* 2009 WL 1064605 at *3 (N.D. Ill. 2009). Orchin and Gadaire could recover fees only if they pleaded and prevailed on a § 5/155 penalty claim. *See Cramer v. Ins. Exchange Agency*, 174 Ill.2d 513, 525-26, 675 N.E.2d 897, 903-04 (1996). Neither of them pleaded such a claim, and their requests for fees against Great-West should be ignored.

## E. If Reached, The District Of Columbia Claims Fail On Their Merits

If the Court explores the merits of the first and fourth claims, the District of Columbia "requirements" raised by Orchin and Gadaire do not apply to group life insurance.[8] The first claim, invoking § 31-4724 of the District's Insurance Code, alleges Dr. Gadaire was entitled to notice of cancellation. "Cancellation" describes when an insurer ends an insurance relationship, and the statute expressly states: "*Exceptions*—Except as provided in § 31-4724, nothing in this section shall apply to or affect…Life insurance." D.C. Code §31-4712(h)(2). Orchin and Gadaire try to impose requirements found in §31-4712, not §31-4724. Those requirements are inapplicable to life insurance, cancellation by Great-West was not even contemplated by the certificate, and Great-West did not cancel the insurance. *See* Exh. 3, GRTWST 17.

The municipal regulations cited in their fourth claim regarding notice to Dr. Gadaire and the District's Insurance Commissioner fare similarly. Those also address an insurer's unilateral cancellation or nonrenewal of liability or property insurance, not an owner/insured failing to pay premiums to keep life insurance intact. *See* DCMR § 26-A301.2-5. Subpart 301.4 thereof expressly states that nothing need be copied to the Commissioner in premium non-payment situations, and the definition of cancellation confirms it is an "insurer's termination, or attempted

---

[8] Life insurance is a type of asset and not a type of insurance that might be unilaterally discontinued by an insurer for excessive claims history since it is obviously a one-claim insurance product.

termination, of the effectiveness of a policy before the end of the policy period." DCMR § 26-A399.1. These are requirements for insurance policies that have recurring expiration dates, not enduring life insurance, and automatic termination for non-payment is not a cancellation.

**F. The Third Claims, Denominated As "Breach Of Contract: Duty To Maintain Contact With The Insured," Fail As A Matter Of Law For Lack Of Contractual Support, Lack Of Factual Support, And Any Such Contractual Right Was Waived If It Ever Existed**

In ¶¶ 68 through 72, Orchin's AC alleges a "failure to maintain contact" claim. *See* Gadaire's AC, ¶¶ 53-56. The claim-specific paragraphs are: 1) coverage under the ADA plan is available only to ADA members and dependents; 2) insureds have a duty to cooperate with and provide information to Great-West; and 3) Great-West has a "reciprocal duty to maintain contact with its insured individuals…which it failed to carry out by failing to send correspondence, notices or premium statements to…Dr. Gadaire." Orchin's AC, ¶ 71; Gadaire's AC, ¶ 55.

The certificate provisions loosely referenced by Orchin and Gadaire, which address topics 1 and 2 immediately above on pages GRTWST 5, 6, 17, 23 and 24 of Exhibit 3 hereto, do not mention a "reciprocal duty to maintain contact" with insureds. The availability of the insurance to ADA members and dependents has nothing to do with a "maintain contact" duty. The fact that persons seeking insurance must provide information, and those insured must cooperate if they submit a claim seeking optional waiver of premium or accelerated benefit payments, impose no duties on Great-West. Orchin and Gadaire feign contractual support for this claim, but cited nothing for their "reciprocal duty" allegations in ¶¶ 71 and 55, respectively, of their ACs.

The certificate allowed Dr. Gadaire to make an assignment absolute in breadth. Exh. 3 at GRTWST 16-17. To accomplish his estate planning his assignment had no reservations. Exh. 2 at GRTWST 108.[9] Orchin and Gadaire peel "duty to cooperate" language from the certificate

---

[9] Insureds relinquish all incidents of ownership over an insurance contract and proceeds to exclude them from their taxable estate. *See generally* 26 U.S.C. § 2042.

heading on page GRTWST 23 of Exhibit 3 to impose upon Great-West a "duty de jour" under the guise of "reciprocity," and since they surmise that the insurance would not have terminated if notices had been sent to Dr. Gadaire, they portray sending him notices as the "cooperation" Great-West failed to perform. [10] This "breach of contract" claim has no contractual basis, and a "reciprocal duty" cannot be manufactured from provisions unrelated to the claimed duty:

> A written contract is presumed to speak the intention of the parties who signed it, and their intentions must be determined from the language used. Additionally, a court cannot alter, change or modify the existing terms of a contract or add new terms or conditions which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included. A presumption exists against provisions that easily could have been included in the contract but were not. Further, where a contract purports on its face to be a complete expression of the parties' entire agreement, courts will not add another term about which the agreement is silent.

*Continental Cas. Co. v. LaSalle Re LTD*, 511 F.Supp.2d 943, 948 (N.D. Ill. 2007) (internal quotations/citations omitted); *see also RTC v. Holtzman*, 248 Ill.App.3d 105, 111-12, 618 N.E.2d 418, 423 (1st Dist. 1993) ("A trial court has no discretion to require parties to accept any terms other than those in their contract" and "no court can rewrite a contract to provide a better bargain to suit one of the parties.") (citations omitted). It is particularly absurd for Gadaire to assert this supposedly contract-based argument given her allegation that "[u]nder the Insurance Policy, no one was entitled to receive notice of the premiums as they became due." Gadaire's AC, ¶ 76.

---

[10] As discussed above in note 3, Orchin and Dr. Gadaire both set up their trusts in 1993, and they allowed Orchin's life insurance to terminate as of July 1, 1999 when he reached the age of 60. Curiously, Dr. Gadaire was also 60 years of age in July 2009 when his insurance terminated for non-payment. Exh. 4, Goodreau Decl., ¶21. It is also speculative to assume Dr. Gadaire would have closely monitored notices in 2009 and caused anything different to happen at around the time of the termination given that Orchin had handled the payments for sixteen years as contemplated by his duties under the trust document. This is borne out by the fact that Orchin always contacted the Gadaire's to put money into the trust's operating account each time he needed to pay a semi-annual premium, Exh. 1 at p.18, line 1 through p. 20, line 2, and yet there is no evidence the Gadaire's asked him what was going on when this longstanding practice failed to occur at the normal times in June and December of 2009. Speculation is not evidence needed to repel a motion for summary judgment. *See generally Maramark v. Spellings*, 2006 WL 276979 *22 (D.D.C. 2006).

Orchin and Gadaire also have no factual support for this claim. They do not allege and have no evidence of a request by Orchin or Dr. Gadaire for duplicate notices that Great-West failed to "cooperate with." Exh. 4, Goodreau Decl., ¶¶ 17-18. The "duty to cooperate" verbiage is not a "wild card" to impose a duty on Great-West, and it cannot "fail to cooperate" if not asked to do anything. Judgment for Great-West should be entered as to the third claims since there is no contractual or factual support for them as a matter of law. Additionally, the failure of Orchin and the Gadaire's to ever assert a breach of this supposed contractual right waived it as shown below.

## G. The Fifth Claims, Denominated As "Breach Of Contract: Duty To Provide Notices To Insured" Fail Because The Trust Document Imposed No Duties On Great-West And Any Arguable Duty Was Waived If It Existed

Orchin and Gadaire also point to the trust document as a source of a duty to send duplicate notices to Dr. Gadaire. The claim-specific paragraphs of this claim allege: 1) the trust document said premium notices would be sent to Dr. Gadaire in addition to Orchin; 2) it was sent to Great-West in 1993; 3) it imposed a contractual duty on Great-West to send notices to Dr. Gadaire that it breached by failing to send him the June 2009 premium-due and August lapse/reinstatement notices, resulting in damages. Orchin's AC, ¶¶ 81-85, Gadaire's AC, ¶¶ 65-68.

Great-West denies having a copy of the trust document prior to claim time. Exh. 4, Goodreau Decl., ¶ 16. However, for summary judgment, Great-West will treat the document as if it had been sent to Great-West in 1993 as now alleged. It's supposed "submission" to Great-West could not impose contractual duties on Great-West and, if that could, any such "duties" were long since waived and forfeited by Dr. Gadaire which binds Orchin and Gadaire.

Dr. Gadaire gave up all incidents of ownership including administering the ownership rights, Orchin acquired those rights, and Great-West had a duty to treat Orchin as the owner. That is clear from the certificate's recognition of absolute assignments. However, nothing

allows certificate owners/insureds to impose contract duties on Great-West by writing them down and "sending them in." The certificate addressed how Great-West and the ADA can change it and the group policy by agreement, Exh. 3, GRTWST 5, but it gave no one the right to unilaterally alter the contract with documents not even designed for Great-West's execution. Mutual assent is basic, and Great-West's duties are not derived from extraneous documents:

> It is elementary that in order to constitute a contract between two parties, there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting….It is also well settled that before any agreement can exist, there must be an offer and an acceptance.

*Bank of Marion v. Robert 'Chick' Fritz, Inc*., 9 Ill.App.3d 102, 108, 291 N.E.2d 836, 840 (5th Dist. 1973); *Wehde v. RTA*, 237 Ill.App.3d 664, 687, 604 N.E.2d 446, 462 (2nd Dist. 1992) ("[A]n enforceable contract requires a meeting of the minds or mutual assent by the contracting parties to its terms and conditions….Thus, it follows that a contract may be enforced only against the parties who have agreed to its terms.").

The trust document does not say Great-West is a party to it, Great-West did not sign it, and it does not state it was effective only if sent to Great-West. Exhibit 12, Trust Agreement. No party has anything from Great-West asking for it. Exh. 4, Goodreau Decl., ¶ 19. The certificate states that "Great-West is not responsible for the validity or effect of any assignment." Exh. 3 at GRTWST 17. Orchin and Gadaire nonetheless insist that Great-West must consider itself bound by a document not contemplated by the certificate to be in its possession in the first place.

The trust document does not reference Great-West in any operative provisions. It merely states "[a]ll premium notices shall be mailed to the Trustee…and to such other parties as the Trustee may designate, with a copy to the Grantor." Exh. 12 at p. 6. The language did not envision vast "extracontractual" power over non-parties--it spoke instead to arrangements Orchin could make. In his deposition he admitted never asking Great-West to send notices to Dr.

Gadaire. Exh. 1, p. 27, lines 2-5. Since only Dr. Gadaire and Orchin signed the document, the "copy to the Grantor" function remained exclusively Orchin's.

The use of trusts as owner/beneficiaries of life insurance contracts and proceeds to accomplish estate planning objectives is common for insured dentists who often have sizeable estates, but they do not send their trust document to Great-West. Exh. 4, Goodreau Decl., ¶19. Few people wish to disclose to Great-West or any other non-essential party their private decisions. *Id.* Its Senior Manager, who has worked in the ADA business unit since 1992, is unaware of anyone sending a trust document to Great-West with an assignment. *Id.* Great-West does not need a trust document to honor ownership assignments and has no reason to review such documents. *Id.* If received, Great-West would not review a trust document to determine anyone's rights and duties, including whether or not the document tried to impose duties on Great-West, because its duties are not determined by documents it is not a party to. *Id.*

The evidence Orchin and Gadaire offered to support the claim that the trust document was sent to Great-West in 1993 underscores the futility of claiming it imposed contractual duties upon Great-West. Ms. Gadaire's affidavit submitted with an appeal of the claim denial stated:

> In April of 1993, my husband executed the Trust Agreement naming Dr. Jeremy D. Orchin 'Trustee'.
>
> Approximately one month later, my husband executed Designation of Beneficiary and Designation of Ownership forms naming Dr. Orchin as the primary owner and beneficiary of his A.D.A. Group Team [sic] Life Plan (the 'Policy').
>
> As office manager, I submitted the designations to Great-West for processing. To the best of my knowledge and recollection, I enclosed a copy of the Trust Agreement with my submission.

Exh. 2 at GRTWST 196, ¶¶ 4-6. Ms. Gadaire does not claim that an authorized owner of the certificate made a request for premium notices to be sent to anyone else. She simply claims to have sent the trust document to Great-West, unsolicited, with no explanation for why it was sent

or what Great-West should do with it. Her affidavit does not change the components of the insuring contract, and what it does <u>not</u> say proves no owner ever asked Great-West to send anyone duplicate premium notices. If an owner had, Great-West would have sent duplicate notices to a properly authorized additional recipient. Exh. 4, Goodreau Decl., ¶ 17.

Finally, even if the trust document could arguably have created a contractual duty on Great-West to send Dr. Gadaire notices, then this obligation arose in 1993. Contract rights can be waived, expressly or impliedly. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc*., 554 F.3d 1133, 1140 (7th Cir. 2009). Implied waiver arises from conduct that is inconsistent with an intention to assert a right. *Id*. A contracting party cannot "lull another into false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Whalen v. K-Mart Corp*., 166 Ill.App.3d 339, 345, 519 N.E.2d 991, 995 (1st Dist. 1988) (quoting *Saverslak v. Davis-Cleaver Prod. Co*., 606 F.2d 208, 213 (7th Cir. 1979)). Once waiver is sufficiently established, it is complete and the party wanting to enforce the right cannot seek judicial enforcement of the right waived. *Whalen*, 166 Ill.App.3d at 343 (citing *Saverslak*). Implied waiver requires clear evidence, and "[w]here there is no dispute as to the material facts and only one reasonable inference can be drawn therefrom, it is a question of law whether the facts proved constitute waiver." *Delta Consulting Group,* 554 F.3d at 1140; *Wald v. Chicago Shipper's Assoc*., 175 Ill.App.3d 607, 621, 529 N.E.2d 1138, 1147-48 (1st Dist. 1988). It is Great-West's burden in this instance to bring forth facts that establish waiver. *See Pantle v. Indust. Comm*., 61 Ill.2d 365,369, 335 N.E.2d 491, 494 (Ill. 1975). These facts are unequivocal.

Although Orchin and Gadaire avoid referencing when this "duty" arose, mentioning only the 2009 notices, Great-West sent Dr. Gadaire nothing after the 1993 ownership change, and was never contacted about him not getting notices. Exh. 4, Goodreau Decl., ¶ 18. If the trust

document could "modify" the certificate to impose a duty on Great-West, the duty was breached continuously and without protest for more than 30 premium notices over 16 years. This course of dealing shows any right of Dr. Gadaire to receive duplicate notices was waived long before this case arose. It cannot be resurrected, and no reasonable factfinder could find otherwise.

**H. The Second Claims, Denominated As "Breach Of Contract: Failure To Tender Proceeds," Fail Because Great-West Did Not Know The Truth At Reinstatement Which Renders Its Waiver Of Termination Ineffective And, If Any Further Analysis Is Conducted, Orchin's Fraud Negates All Criticisms Of Great-West's Actions**

In ¶¶ 64-67, Orchin's AC pleads a breach of contract claim alleging: 1) the insurance certificate was in effect when he claimed benefits; 2) Great-West had a contractual duty to pay but did not; and 3) he, the trust, and Gadaire have been damaged in the amount of the insurance benefit. *See also* Gadaire's AC, ¶¶ 49-52. In choosing the simple claim-specific allegations, Orchin and Gadaire avoided what insurance claimants usually plead—a reference to insurance being in place on the date of a loss. That is telling, but they surely insist the retroactive nature of the January 18, 2010 reinstatement renders anything before then irrelevant. It is thus necessary to address the threshold waiver issue purposely avoided by Orchin and Gadaire's pleadings.

**1. How Illinois law handles insuring an already deceased person**

In *Miller v. The Union Central Life Ins. Co*., 110 Ill. 102, 1884 WL 9854 *3 (Ill. 1884), the Illinois Supreme Court addressed an overdue premium payment accepted by an insurer which was paid by a friend of the insured at a time when both he and the agent accepting payment were unaware of the insured's recent death. The court stated:

> We can not, as against the conclusions of fact settled by the judgment of affirmance of the Appellate Court, assume that any agent of the appellant was authorized either to waive a forfeiture already accrued, or make a renewal contract of insurance. A waiver presupposes knowledge of the right waived, and is not to be inferred from a purely negligent act, or one done under misapprehension of the real condition of the rights of the parties at the time; and a renewal contract of insurance necessarily requires the continued existence of that which is insured. The payment by Farnham, which was

made by him and received by the company in ignorance of the fact that Miller was then dead, could, then, amount to nothing, and appellant acquired no rights thereby.

The issue arose again in *Van Hulle v. State Farm Mut. Auto. Ins. Co*., 44 Ill.2d 227, 254 N.E.2d 457 (Ill. 1970), which involved terminated automobile insurance with a life insurance benefit. A lapse notice was sent by the insurer informing the insureds of the lapse/termination of the insurance which stated "it would be reinstated upon payment of the premium." 44 Ill.2d at 229, 254 N.E.2d at 459. The insured's wife later died in a car accident. A check was mailed later that day to the insurer without explanation, but the local insurance agent knew of the accident that day. About two and a half weeks later he wrote to the insurer advising it of the details. 44 Ill.2d at 229-30, 254 N.E.2d at 459. Although his writing preceded the insurer's cashing of the check by only four days, the court imputed his knowledge of the loss from the day it happened. 44 Ill.2d at 231, 254 N.E.2d at 460. The court found the insurer waived the policy's termination by accepting the premium with its agent's knowledge, but stressed knowledge was crucial:

> In many jurisdictions waiver of a forfeiture has been upheld under circumstances where the insurer, *with knowledge of an intervening loss*, accepts a premium tendered for the purpose of covering the loss.
>
> *To imply the waiver of lapse the insurer must have knowledge of the intervening loss.*
> ***
> *Finally, to constitute waiver an intent to get retroactive coverage must be communicated to the insurer.*

44 Ill.2d at 230-32, 254 N.E.2d 460-61 (emph. added). The Illinois Supreme Court thus maintained the requirement that for waiver to be effective, it had to be "knowing and intelligent," i.e., with knowledge of the true facts. *See also Amos v. Allstate Ins. Co*., 184 P.3d 28, fn. 18 (Alaska 2008) (boat insurance case where loss occurred during gap in coverage, citing *Van Hulle* and stating "an insurer only waives its right to insist on a gap in coverage when the insurer retains the premiums *and* had prior knowledge of the intervening loss;" emph. in original).

It is Orchin and Gadaire's burden to prove that Great-West's waiver of termination on January 18, 2010 was knowing and intelligent. *See Pantle v. Ind. Comm.*, 61 Ill.2d 365,369, 335 N.E.2d 491, 494 (Ill. 1975). They did not allege and cannot show Great-West's employees knew Dr. Gadaire was dead. Their second claims try to avoid the intelligent waiver requirement necessary to make Great-West's reinstatement enforceable with incorporated allegations that blame Great-West for not knowing about Dr. Gadaire's death, asserting it should have demanded more information up front, required an application from him, or created an elaborate "reinstatement contract" to give itself an "out." Their disguised premise is that Great-West's alleged shortcomings destroy the "with knowledge" standard and turn it into a "knowledge that was possible to ascertain or protect against" one. These arguments are also meant to excuse and "wall off" Orchin's actions.

Orchin and Gadaire's artful burden-shifting to turn the issue into a disguised "negligent reinstatement" claim against Great-West fails. Absent actual or imputed knowledge of Dr. Gadaire's intervening death, Great-West had the right to retract its reinstatement and did so by denying Orchin's claim and tendering a premium refund to him. Great-West indisputably had no knowledge of Dr. Gadaire's death. It is Great-West's knowledge, not Orchin's purported beliefs as to what he thought Great-West needed to know, that matters. Insurance was not in place when Dr. Gadaire died, there is no subsequent effective waiver because Great-West was unaware of the true facts, and the analysis ends here with judgment as a matter of law for Great-West as to the second claims for relief regardless of Orchin's motivations on January 18, 2010.

It is unnecessary to sift through Orchin and Gadaire's criticisms of how Great-West could have better protected itself from Orchin, a wrongdoer seeking relief from the innocent party who trusted him. Insurers often trust insureds and owners without marshaling all possible resources

to verify information they provide, starting with the application. "An insurer is entitled to rely upon the truthfulness of an applicant's answers and has no duty to conduct an independent investigation into their accuracy." *Kioutas v. Life Ins. Co. of Virginia*, 35 F.Supp.2d 616, 623 (N.D. Ill. 1998)(citing cases). Standards do not change for reinstatement of terminated coverage, indeed an insurer's right to trust customers should grow stronger with time. Great-West did not have to vigilantly anticipate and guard against a previously long-term customer/owner calling up to reinstate long-since terminated life insurance on a deceased person.

Since Orchin had superior knowledge, to try to obtain retroactive coverage for an intervening loss he had to disclose that he was seeking to insure a loss he knew had already occurred. His "you had to be more careful with me and it didn't matter anyway" allegations try to fill the void in four ways. He faults Great-West for not "inquir[ing] of [him] whether Dr. Gadaire was alive or deceased as of January 18, 2010" [11] and faults it for not having a "written policy that it communicated to its insureds that an insured had to be alive on the date that a policy was reinstated." Orchin's AC, ¶¶ 42-43.[12] He also faults Great-West for deviating from and "waiving" its "policy" of requiring an application from an insured when this much time had passed since termination, *id*. at ¶¶ 44-45, and asserts that since Great-West considered Dr. Gadaire uninsurable as of January 18, 2010 due to health changes, it required only that premiums be paid and his actual existence did not matter. *Id*., ¶ 46. *See* Gadaire's AC, ¶¶ 28-33.

**2. Blaming Great-West for not pinning Orchin down on Dr. Gadaire's status is immaterial due to his objectively-proven fraud and factually false**

---

[11] Orchin curiously pleaded this assertion based "upon information and belief" in his ¶ 42.

[12] The alleged failure to communicate to insureds [more accurately owners] the requirement that an insured be alive on the date of reinstatement is immaterial in the context of communications that first commence <u>after</u> death and is proven wrong by the language in the lapse/reinstatement notice, effective since mailing is not a genuine issue and is proven in § H(5) below. *See* Exh. 6, GRTWST 453.

Great-West's employees did not vigorously examine Orchin about Dr. Gadaire's status. However, he affirmatively misled them from the start. His first words when he spoke to Great-West employee Jan Guthrie framed the problem as solely a billing issue:

> Hi Jan…. I'm the trustee of a life insurance trust *for a friend of mine* and I think I need to clear up a discrepancy in billing. I haven't gotten a statement for the balance that was due in December. I think I've moved several times and I've put in a change of address but I'm not sure it's gotten through so I need some help to clarify this.

Exh. 7 at 1 (emph. added). He stated he was the trustee for "a friend of mine," not a "former" friend, plainly describing Dr. Gadaire in the present tense, and Guthrie reasonably understood him to be talking about a live person. Since she did not expect an exception to Great-West's usual position would be made, she explained that Dr. Gadaire would need to reapply:

> The only thing to get it, the only way to get his coverage back would be for him to submit an application and it's basically, he would have to re-apply. They would take a look at how he answers all the questions to determine whether he needs to go through the underwriting process. But chances are he probably will because it's been more than six months past the renewal of the last renewal. So what I can do is send you or give you our website and application. You can download the application and turn it over to him so that we can get this back in force for him but it is going to be a process.

Exh. 7 at 2-3. Orchin's <u>immediate</u> response to this clear indication to him that Guthrie understood Dr. Gadaire to be alive was to avoid her and the topic she had just raised:

> Is there someone else I can talk to that might have more influence because I'm feeling so guilty, I've been a trustee for 15 years and I've never let it slip and I don't want [him or them—*parties disagree*] to know that I did this. There must be a way that I can pay back the past monies or something.

*Id*. at 3. Although there is disagreement between Orchin and the other parties as to whether he said at this juncture that he didn't want "*him*" versus "*them*" "to know that [he] did this," the difference in verbiage is immaterial. Great-West employees understood Orchin to be referring to the insured, Dr. Gadaire, as a person Orchin "did not want to know," whether singularly or as

one of the persons with an obvious interest in the insurance since he was the grantor of the trust.

Exh. 10, Guthrie Decl., ¶ 2;  Exh. 11, Fix Decl., ¶ 4; Exh. 8, DeMills Decl., ¶ 3.

Orchin plainly understood the critical significance of Dr. Gadaire's passing prior to reinstatement of the insurance certificate.  He stated in his deposition:

> **Q**.  Do you have any recollection as to how that payment came to be made to Great-West on or about January 25th 2010?
> **A**.  Yes.
> **Q**.  Could you tell us what that is?
> **A**.  After Dr. Gadaire passed away, I knew that I was trustee of the life insurance trust, so I needed to look and get everything together. And then I realized that I had not—I went back to all—all my forms and I realized that I had not written a check to Great-West in 2009.
> *And so I was very concerned* and embarrassed because I knew that he had passed away. So I called Great-West and explained to them what had transpired in the past year.
> **Q**.  When did you call Great-West?
> **A**. I believe it was January 18th.
> **Q**.  Why did you happen to call them on that date?
> **A**.  Because that's when I realized that I had not written any checks for the premium due it.
> [Orchin testified about speaking to two Great-West employees]
> **Q**.  And what do you recall asking them?
> **A**.  I asked—I said I was very embarrassed; they were my very good friends and that I had moved several times and never received the premium notices; and I was embarrassed about it and I asked them to reinstate the policy and I would pay the back premiums if they would reinstate the policy.

Exh. 1 at p. 40, line 20--p.42, line 9 (emph. added).  Despite admitting that not paying a premium for over six months coupled with Dr. Gadaire's death made him "very concerned," Orchin initially testified that he did not think Great-West would find Dr. Gadaire's death important. He also admits he intended to raise *only* the premium notices issue when he spoke to its employees:

> **Q**.  Did you know at that time when you called on January 18th 2010 that Dr. Gadaire had passed away?
> **A**.  Yes.
> **Q**.  Why did you not give that information to Great-West?
> **A**.  I wasn't asked.
> **Q**.  Did you think it was important information?
> **A**.  No, I was just—I did not think it was important at the time.

**Q**. Why not?

**A**. Because it had nothing to do with the fact that I had not received their notices of payment or that I had not paid them. *And all I wanted to do was say that I hadn't gotten the notices and I'd like to reinstate the policy.*

*Id*. at p. 42, line 10 through p. 43, line 3 (emph. added). When the topic was revisited later in his deposition by Great-West's counsel, Orchin insisted he properly avoided disclosing Dr. Gadaire's death to Great-West but admitted disclosure would "probably" have changed things:

**Q**. In making those calls did you form any belief, any thought, that Great-West employees would have an interest in knowing that Dr. Gadaire had passed away?

**A**. No.

**Q**. Why not?

**A**. He had passed away. All my thoughts were just to get the policy reinstated. They never asked. Just—I just didn't.

**Q**. So they didn't ask, so it was okay to not tell them?

**A**. Yes.

**Q**. Okay. Do you think you concealed that fact from them?

**A**. No.

**Q**. Why not?

**A**. It never came up in the discussion. I didn't—they never—

**Q**. Well—

　　Mr. MURRAY: Let him finish his answer. Go ahead. Are you finished with your answer?

　　THE WITNESS: Yes.

　　BY MR ROSWELL:

**Q**. You understand that the life insurance company's job is to collect premiums and pay death benefits, correct?

**A**. Yes.

**Q**. And to pay a death benefit they have to know that someone has passed away, correct?

**A**. Yes.

**Q**. But you don't think it was relevant at that time for Great-West to know that Dr. Gadaire had passed away?

**A**. No.

**Q**. Do you think it would have changed the outcome of your calls with Ms. Fix?

　　MR. DELANEY: Objection, calls for speculation.

　　BY MR. ROSWELL:

**Q**. You can answer. I think you did answer, we just didn't hear it.

**A**. I mean, probably.

*Id*., p.84, line7—p. 86, line 5.

Fraud in the inducement requires the complaining party to prove that the wrongdoer "must have made a false representation of a material fact knowing or believing it to be false and doing it for the purpose of inducing [the complaining party] to act." *Hassan v. Yusuf*, 408 Ill.App.3d 327, 343, 944 N.E.2d 895, 910 (1st Dist. 2011). "Fraud in the inducement renders a contract voidable at the option of the injured party." *Bresler Ice Cream Co. v. Millionaires Club, Inc.*, 71 Ill.App.2d 342, 343, 218 N.E.2d 891, 893 (4th Dist. 1966). "The law is clear that a person who, by his conduct, contributes to the misapprehension of another as to a material matter, and intentionally fails to correct the misapprehension, is guilty of fraud." *Tcherepnin v. Franz*, 393 F.Supp. 1197, 1217 (N.D. Ill. 1975) (collecting cases); *see also Athey Products Corp. v. Harris Bank Roselle*, 901 F.Supp. 1355, 1359 (N.D. Ill. 1995) (following *Tcherepnin*).

The proof of Orchin's fraudulent inducement is established as a matter of law. He knew Dr. Gadaire was deceased, falsely represented him as a living person, knew that was not Great-West's understanding, and his careful script quickly shifted the focus to moving and not receiving notices, all with the plain intent to get insurance coverage on a deceased person put back in place—and in place before the topic of a claim could arise. Subjective and conclusory denials of intent that contradict objective state of mind evidence are immaterial:

> Mrs. Hinsley contends that the affidavits raise issues of materiality and credibility because they go to the issue of fraudulent intent. 'Intent to defraud can be decided as a matter of law.' *BMG Music* v, *Martinez,* 74 F.3d 87, 90 (5th Cir. 1996). A party's self-serving and unsupported claim that she lacked the requisite intent is not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud.

*In re Matter of Hinsley,* 201 F.3d 638, 643 (5th Cir. 2000). *See also U. S. v. Denlinger,* 982 F.2d 233, 237 (7th Cir. 1993) ("Where all circumstantial evidence points to fraudulent intent, at least some of it has to be explained away. Neither summary judgment nor directed verdict can be avoided by simply saying, 'nevertheless, it is not so.'"); *Piamba Cortes v. A. A. Inc.,* 177 F.3d

1272, 1292 n. 14 (11th Cir. 1999) ("there are many instances in the law where the evidence of state of mind is so unequivocal that summary judgment is proper and, indeed, expressly mandated by Rule 56" (quoting lower court)); *F.E.C.* v. *Toledano,* 317 F.3d 939, 951 (9th Cir. 2003) (same observations).

Orchin's convenient denials of intent to mislead Great-West regarding Dr. Gadaire's death require rejection. Any reasonable person knows that a death long after premiums have gone unpaid looms large. If, as he initially insisted, he did not consider Dr. Gadaire's death something Great-West would care to know, then he should have felt no urgency since premiums were long overdue. However, he quickly advanced the funds from his own because he "wanted to make sure that the policy was reinstated as soon as possible." Exh. 1, p. 44, lines 16-17. Unless he specifically wanted coverage reinstated *before* Great-West learned of the death, as it did from Dr. Tromblay two weeks later, it is inexplicable that he would call Great-West immediately on the Monday morning after Dr. Gadaire's Friday death. He admitted in his deposition that timing was at that point important to him, and he wanted the insurance reinstated <u>before</u> raising a claim:

> **Q**. So why was your first call to check on a billing discrepancy and not just to make the claim and explain the billing discrepancy?
> **A**. I wanted to make sure the policy was—it was reinstated, was in full force before I filed a claim. I wasn't—I wasn't—I hadn't gotten everything together enough to file a claim yet.

*Id.*, p. 76, lines 12-18.

The only reasonable conclusions from Orchin's calls and testimony are inescapable; he steered Great-West's employees to only what he wanted on the table--his claim of not receiving notices. He not only contributed to a misapprehension, he alone created it. He was "very concerned," and despite initially insisting that Great-West employees would have had no interest in Dr. Gadaire's passing, even he has admitted it "probably" mattered to them. So he opened by

referring to Dr. Gadaire as "a friend of mine," using present tense, and when Guthrie indicated she understood Dr. Gadaire to be alive he ended discussions with her. He twice said he did not want "him" or "them" to know about the default and termination. Orchin fraudulently misled Great-West's employees to remain unaware that the insurable event had already occurred.

Orchin cannot fault Great-West's employees, who tried to help him, for trusting him, and he experienced no harm. Nor can he insulate his actions because his victim failed to invoke sufficient anti-fraud measures to catch the fraud in real time. "One guilty of fraudulent misrepresentation cannot assert that the person defrauded was negligent in failing to discover the truth." *Vaughn v. Speaker*, 126 Ill.2d 150, 163, 533 N.E.2d 885, 890 (Ill. 1988) (citing authorities). <u>All</u> criticisms of Great-West's actions are thus immaterial. The assertion that Great-West failed to inquire of Orchin as to Dr. Gadaire's status is also factually wrong because he short-circuited any need to inquire by affirmatively misrepresenting Dr. Gadaire's status, and closing the door when he knew his misrepresentation was taken as true. Great-West caught the fraud at the most logical time—when the claim was made.

### 3. Faulting Great-West for deviating from requiring an application is immaterial

Orchin and Gadaire oddly fault Great-West for departing from its usual procedure of requiring an application because, had it <u>not</u> done so, it would have discovered the truth and Orchin's "place saver" reinstatement would not have happened. They nonetheless assert that Great-West is "stuck" because it waived its usual requirement of an application. This seeks to use his fraud offensively as a sword, obviously if he had described Dr. Gadaire's status fairly an application was moot, and this is simply another variation of Orchin's "Great-West should have done more to catch me" arguments foreclosed by *Vaughn*.

A corollary argument Orchin and Gadaire seem to make is that Great-West was duty-bound to follow usual internal procedures, it "breached" its usual procedures, Orchin can raise the deviation as breach of a right afforded to him and claim "harm," even though deviation was temporarily to his advantage, and Great-West has no recourse.

Nobody has a right to insist on utilization of any particular set of procedures at a point when no contract exists. The certificate warned of that and confirmed Great-West would operate post-termination with unlimited discretion to decide whether to accept premiums in default. Exh. 3, GRTWST 10. It did not say that any particular criteria or considerations would govern Great-West's discretion. Orchin and Gadaire have no right to insist on any particular processes or to insist that his fraudulently-induced reinstatement "vested" due to a deviation in processes.

Nothing Great-West did caused harm to Orchin or caused him to change position, other than perhaps to adopt for a time the hope that he might have successfully fooled Great-West into insuring an already deceased person. As discussed above, he and Gadaire cannot complain that Great-West should have done more or done things differently and that his fraud is untouchable as a result. The reinstatement obtained by fraud was voidable as Great-West properly elected.

**4. The assertion that Great-West knew Dr. Gadaire was uninsurable, and thus whether he was dead or alive made no difference, is immaterial due to Great-West's indisputable lack of knowledge of the loss, Orchin's indisputable fraud, and factually false**

With the assertion in ¶ 46 of his AC, Orchin substitutes his judgment for Great-West's and concludes that Dr. Gadaire's status was immaterial to Great-West's reinstatement decision because its letter to Orchin confirming reinstatement did not expressly address Dr. Gadaire's status. He faults Great-West for not more explicitly reserving the right to complain about what he had fraudulently induced it to believe was not an issue—Dr. Gadaire being alive.

The fact that Great-West was indisputably unaware of the truth allows Great-West to void the acceptance of payment and reinstatement as a matter of law because it was done without knowledge of the loss, thereby rendering waiver of termination ineffective. Like the others, this criticism is not a substitute for knowledge and need not even be reached by the Court, but Orchin's affirmative fraudulent inducement to obtain reinstatement is a separate and independent basis for voiding the reinstatement. Because fraudulent inducement is objectively proven, the *Vaughn* case provides another basis for disregarding this novel argument that Great-West "under-documented" the reinstatement and thereby lost the right to void it. If any further analysis is necessary, parties are not required to include a "do not defraud me" provision in a confirmatory letter in order to raise a fraud by the other party.

Factually, the letter Orchin refers to was not a standardized—it was written to deal with the facts known to Nancy Fix, on January 18, 2010. Exh. 9. Fix called Orchin to inform him of Great-West's decision to allow reinstatement <u>before</u> the letter was created and sent and he told her then that he would pay the premium online that day. Exh. 7 at 6. The letter did not address a list of contingencies because it did not contemplate lag time between payment and reinstatement, which were expected to happen almost simultaneously. A second letter was not sent to Orchin when, during a conversation <u>as it was being sent electronically,</u> he changed his mind to pay by check instead, *id.* at 7, but that is immaterial because this case is not about a death on the same day as the letter or thereafter in relation to receipt of the premium. *See also* Exh. 11, Fix Decl.,¶ 5. The letter <u>did</u> expressly contemplate that the insured was alive since it confirmed Great-West's unwillingness to make any future exceptions, and Orchin cannot complain that it contemplated a payment timing promise he made but then changed. Great-West did not have to create a letter that listed all conceivable legal protections available to it for them to survive.

Orchin cannot speak for Great-West, and Great-West never indicated it was waiving its right to reinstate insurance while there was a risk to insure. The concept of insuring risk does not exist when a party seeks to "insure" a loss he knows has already occurred--no risk is involved and the knowledgeable party is simply entering into a payment contract. Exh. 4, Goodreau Decl., ¶¶ 12,14. This common sense explains why nobody reasonably waits until they have a crumpled bumper before getting automobile insurance, or waits for roof damage before getting homeowner's insurance. Great-West took the risk that Dr. Gadaire's health might have worsened from 2007, but that presented risk, not an already known, payable loss. No legal theory requires Great-West to "insure" already known losses, and undisputed facts show it never agreed to.

**5. The vague references that Orchin denies receipt of the premium and lapse/reinstatement notices does not create a claim or raise a genuine issue of fact**

Finally, although Orchin indisputably received and paid the "post-two moves" premium notice sent in December 2008 that covered the premium period of January 1, 2009 through June 30, 2009, and when he called Great-West on January 18, 2010 he readily admitted failing to get an address change filed, he and Gadaire now speculate that Great-West might not have sent the premium and lapse/reinstatement notices that went unpaid because he denies their receipt. Orchin's AC, ¶¶ 28, 30, 32-33; Gadaire's AC, ¶¶ 19-23. Their assertions are immaterial.

Speculation is not evidence needed to repel a motion for summary judgment. *See generally Maramark v. Spellings*, 2006 WL 276979 *22 (D.D.C. 2006). Moreover, denying receipt of a premium notice is legally insufficient in challenging whether insurance terminated. An Illinois federal court observed that "proof of notice may be established as a matter of law," and, analogizing to a standard set forth in a statute that is expressly inapplicable in the group insurance context just as it was in the universal life context therein at issue, concluded:

While an insurer is required to provide notice to a policy holder that a premium is

overdue before rescinding that policy, it is only required to prove that a legally
sufficient notice was 'addressed and mailed,' not that it was received by the policy
holder….An insurer may prove that notice was addressed and mailed either by an
affidavit from a member of the company responsible for mailing such notices or by
presenting records that confirm the particular notice was sent consistent with the
company's customary practices.

*Spinelli v. Monumental Life Ins. Co*., 476 F.Supp.2d 898, 909 (N.D. Ill. 2007) (quoting and citing

*Hotaling, M.D. v. Chubb Sovereign Life Ins. Co*., 241 F.3d 572, 579-81 (7th Cir. 2001)).[13]

It is highly "opportunistic" for Orchin and Gadaire to speculate about the mailing of either

the premium or lapse/reinstatement notice given Orchin's admission that he moved twice without

giving Great-West a new address.  In his deposition he understood the likely consequences:

**Q**. All right. Do you know how long a change of address filed with the U.S. Postal
Service will last?
**A**. Six months, unless you ask for more.
**Q**. Did you—how many times did you ask the U.S. Postal Service for more time on
the change of address?
**A**. I don't recall.
**Q**. Did you ever ask them for more time?
**A**. I don't recall.

Exh. 1, p.40, lines 6-15.  Moreover, Gadaire expressly pleaded that Orchin's moves do not shield

his premium payment defaults because premiums were due regardless of notice:

Trustee's duty to pay the premiums was not contingent on receiving notice of the
premiums being due.

Under the Insurance Policy, no one was entitled to receive notice of the premiums as
they became due. Trustee was required to pay the Policy premiums whether he
received notice or not.

Gadaire's AC, ¶¶ 74, 76.  Nonetheless, to the extent there is even arguably a mailing of notices

issue, Gina Goodreau's declaration testimony, supported by documents, establishes that:

1) Great-West retained copies of the premium due and lapse/reinstatement notices
and produced them prior to and during litigation;

---

[13] *Hotaling* embraced computer/electronically generated records of mailing which are now deemed
preferable to pure human testimony regarding sizeable mailings. 241 F.3d at 580-81.

2) The address the notices were sent to was the same billing address for Orchin ever since he became the certificate owner in 1993;

3) Great-West has no record of any premium notice sent to Orchin ever being returned for a faulty address;

4) Orchin never contacted Great-West to report any problems with receipt of premium notices prior to Dr. Gadaire's death; and

5) Great-West's sophisticated and reliable administration system maintains documents that prove the system was working properly when the premium due and lapse/reinstatement notices were mailed to Orchin at the correct address at the time.

Exh. 4, Goodreau Decl. ¶¶ 4, 22-25. Goodreau has discussed the creation, mailing, tracking and retention of notices, practices consistently followed when they are automatically generated, their prompt mailing, and the history of prior notices sent to Orchin's address without incident. This establishes as a matter of law that the notices were sent.

## V. Conclusion

The first and fourth claims are properly decided in Great-West's favor because they are premised on District of Columbia requirements that are inapplicable for choice of law and merits reasons. The third and fifth claims are properly decided because Great-West had no contractual duty to send Dr. Gadaire premium notices, no request that it do so was ever made, and even if a right to notice existed, inaction by Orchin and the Gadaires unequivocally waived these claims.

The second claim, which implicates the bulk of Orchin and Gadaire's assertions, cannot overcome that in order for Great-West's initial decision to gratuitously waive termination to be enforceable, it had to know that the insurable event had occurred, which it did not, regardless of what Orchin believed it cared to know. When Great-West gained knowledge of the truth it properly denied the claim and tendered premiums to Orchin. Nothing Great-West did without knowledge of the truth matters. Orchin and Gadaire cannot create a claim by criticizing Great-West's actions when it lacked knowledge that the insurable event had already occurred.

If the Court decides that anything Orchin and Gadaire have raised about Great-West's processes and procedures on January 18, 2010 requires analysis, his actions and the objective evidence of his state of mind establish as a matter of law that he fraudulently induced Great-West to waive termination. They cannot complain that Great-West failed to take all possible precautions to protect against him and nobody was "harmed" by Great-West's actions because the facts concerning the timing of the insurable event in relation to termination were already set in stone. They also cannot insist Great-West had to follow any particular procedures when considering reinstatement because no contract governed its actions, indeed the terminated certificate had warned of its unlimited discretion. Finally, the assertion that the insurance termination was defective because Orchin denies receipt of notices is immaterial.

Great-West requests summary judgment on all five claims.

Respectfully submitted,

       / s / Matthew J. Youssef
Craig D. Roswell, Esquire #433406
Matthew J. Youssef, Esquire #MD17910
NILES, BARTON & WILMER, LLP
111 South Calvert Street, Suite 1400
Baltimore, Maryland 21202
(410) 783-6300 *telephone*
(410) 783-6363 *facsimile*
cdroswell@nilesbarton.com
mjyoussef@nilesbarton.com
***Counsel for Defendant,***
***Great-West Life & Annuity Insurance Co.***

4821-3883-9066, v. 7