UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Jeremy D. Orchin, Trustee of the Eugene C. Gadaire Insurance Trust | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Case No. 1:12-cv-1743-BAH |
| Great-West Life & Annuity Insurance Company | ) ) ) | |
| Defendant | ) ) | |
| Elizabeth Gadaire | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Case No. 1:13-cv-00055 (consolidated with above) |
| Jeremy D. Orchin, et al. | ) ) | |
| Defendants, et al | ) ) | |

**DEFENDANT GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Great-West Life & Annuity Insurance Company ("Great-West"), through counsel, and in conformance with Local Rule 7(h), submits this statement of material facts which it contends are undisputed and present no genuine issue.

1. Great-West underwrites and insures the group term life insurance plan sponsored and maintained by the American Dental Association ("ADA") under which life insurance is available to qualifying ADA members. Orchin's Amended Complaint, ¶¶ 8-9; Gadaire's Amended Complaint, ¶¶ 6-7; Exhibit 4, Goodreau Decl., ¶ 1.

1

2.      Prior to June 16, 1993, Dr. Eugene Gadaire ("Dr. Gadaire") was insured under the ADA group term life insurance plan in the amount of $750,000.00 and was the owner of his individual insurance certificate designated as certificate number 91130.  Orchin's Amended Complaint, ¶¶ 8, 11-12; Gadaire's Amended Complaint, ¶¶ 8-10.

3.      On June 16, 1993, Dr. Gadaire executed a document appointing "Jeremy D. Orchin, as Trustee of the Eugene C. Gadaire Insurance Trust, under Agreement dated April 5, 1993" as the beneficiary of his life insurance.  Exhibit 2, GRTWST 106.

4.      On June 16, 1993, Dr, Gadaire executed a document entitled "ABSOLUTE ASSIGNMENT OF ALL INCIDENTS OF OWNERSHIP" which assigned his insurance certificate and all rights thereunder to "Jeremy D. Orchin, as Trustee of the Eugene C. Gadaire Insurance Trust, under Agreement dated April 5, 1993," and the document designated the address of record for communicating with the Trustee owner as "2831 44th ST, NW, Washington, D.C. 20007."  Exhibit 2, GRTWST 108.

5.      After the assignment referenced in ¶ 4 above, the person whose life was insured remained Dr. Gadaire.  Exhibit 2, GRTWST 106, 108; Orchin's Amended Complaint, ¶ 12; Gadaire's Amended Complaint, ¶¶ 10-11.

6.      The premiums required to maintain the life insurance were payable semi-annually, and due on January and July 1st of each year.  Exhibit 3 at GRTWST 10; Orchin's Amended Complaint, ¶ 25; Gadaire's Amended Complaint, ¶ 11.

7. There is no evidence indicating that Dr. Gadaire called or wrote to Great-West to request that duplicate administrative correspondence such as premium notices be sent to him prior to assigning ownership of the insurance certificate to Jeremy Orchin as trustee. Exhibit 4, Goodreau Decl., ¶ 17.

8. There is no evidence indicating that Orchin called or wrote to Great-West to request that duplicate administrative correspondence such as premium notices be sent to Dr. Gadaire after Orchin became the owner of the insurance certificate. Exhibit 4, Goodreau Decl., ¶ 17; Exhibit 1, Orchin Depo., p. 16: 10 – 17:22.

9. There is no evidence indicating that Elizabeth Gadaire called or wrote to Great-West to request that duplicate administrative correspondence such as premium notices be sent to Dr. Gadaire either before or after the assignment. Exhibit 4, Goodreau Decl., ¶ 17; Exhibit 2 at GRTWST 196.

10. There is no evidence that anyone ever contacted Great-West between the time of the assignment and Dr. Gadaire's death to report or inquire as to why he was not receiving duplicate premium notices. Exhibit 4, Goodreau Decl., ¶ 18.

11. Elizabeth Gadaire was never the owner of the insurance certificate. Orchin's Amended Complaint, ¶ 12; Gadaire's Amended Complaint, ¶ 9.

12. The insurance certificate contains an express provision that states the ADA elected Illinois law as the law to govern any dispute arising in connection with the certificate or group policy. Exhibit 3 at GRTWST 24.

13. From December 1993 through December 2008, Great-West sent premium notices to Orchin which Orchin paid within the period allowed to maintain the life insurance. Exhibit 4, Goodreau Decl., ¶ 4.

14. Great-West followed the same procedures for sending premium notices that it utilized for sending prior notices when it sent premium notices to owners of ADA group term life insurance certificate in June 2009 for premiums due on July 1, 2009. Exhibit 4, Goodreau Decl., ¶¶ 5, 24.

15. Great-West has maintained and produced a copy of the premium notice it sent to Orchin in June of 2009. Exhibit 5; Exhibit 4, Goodreau Decl., ¶¶ 5, 24.

16. Orchin claims to have moved at least twice since he resided at the billing address on file with Great-West as of June 2009 and admits that he did not communicate an address change to Great-West. Exhibit 7 at 2; Exhibit 1, p. 80:4-8 and 23:2-17.

17. Orchin moved from one address in the District of Columbia to a second address in Bethesda, Maryland while renovating another home in 2007. Exhibit 1, p. 20:22 – 21:16.

18.     Orchin moved again from Bethesda, Maryland back to a new address in the District of Columbia eight months later in 2008 between April and June. Exhibit 1, p. 21:18 – 22:18.

19.     The December 2008 premium notice was sent to Orchin's original address and it was paid by him. Exhibit 1, p. 34 line 1-21.

19.     Orchin did not pay the premium due on or before July 1, 2009. Exhibit 7 at 2, 4; Exhibit 1, p. 41, lines 13-18; Exhibit 4, Goodreau Declaration, ¶ 4.

20.     The insurance certificate stated:

> **Payment**
>
> ...Premiums are payable by the insured Member to the Company at the Company's Executive Offices. Any premium not paid on time will be in default.
>
> ***
>
> **Grace Period**
>
> After the first premium has been paid, 31 days are allowed to pay a premium in default. During this time, the insured Member's insurance will remain inforce unless the insured Member requests in writing to terminate the coverage. If the premium is not paid by the end of the days of grace, the insured Member's insurance will terminate.
>
> **Acceptance of Premiums in Default**
>
> The Company, at its sole discretion, may, but is not required to, accept a premium that is in default or extend the time for a premium to be paid. The Company's decision to accept a late premium, or extend the time for a premium payment, if any, shall not be construed as a continuing waiver of the right to enforce the premium payment terms and conditions set forth in the individual Certificate.

Exhibit 3 at GRTWST 10.

21. Orchin did not pay the premium due within the 31 day grace period that ended July 31, 2009. Exhibit 7 at 2, 4; Exhibit 1, p. 41, lines 13-18; Exhibit 4, Goodreau Decl., ¶¶ 3-6.

22. On August 1, 2009, the insurance certificate terminated for non-payment effective July 1, 2009 pursuant to the language contained in the certificate of insurance. Exhibit 3 at GRTWST 10.

23. In August of 2009 Great-West, following the same procedures for all prior notices, sent Orchin a notice advising that the certificate had been terminated because Great-West had not received the premiums due on July 1, 2009 within the 31 day grace period. This notice is automatically sent out in the ordinary course to all former owners of ADA group term life insurance certificates concerning certificates terminated for unpaid premiums during the current billing cycle. Exhibit 4, Goodreau Decl., ¶¶ 4-6, 25.

24. The lapse/reinstatement notice that Great-West sent to former owners of ADA group term life insurance certificates in August 2009 concerning certificates that had terminated gave former owners a new period from the end of the grace period within which to pay premiums in default and reinstate the terminated coverage. Exhibit 6; Exhibit 4, Goodreau Decl., ¶¶ 6, 25.

25. Great-West has maintained and produced a copy of the lapse/reinstatement notice it sent to Orchin in August of 2009. Exhibit 6. Exhibit 4, Goodreau Decl., ¶¶ 6, 25.

26. Orchin did not pay the premium due within the new period offered in the lapse/reinstatement notice. Exhibit 7 at 1-5; Exhibit 4, Goodreau Decl., ¶¶ 3-6.

27. Dr. Gadaire died on January 15, 2010. Orchin's Amended Complaint, ¶ 36; Gadaire's Amended Complaint, ¶ 25.

28. Orchin knew Dr. Gadaire had already died when he called and spoke to Great-West employees Jan Guthrie and Nancy Fix on January 18, 2010. Exhibit 1, Orchin depo. trans, p. 40, line 20 through p. 42, line 15 and p. 63, line 13 through p. 64, line 2.

29. Orchin did not inform Great-West employees Jan Guthrie and Nancy Fix of Dr. Gadaire's death when he spoke to them on January 18, 2010. Exhibit 7 at 1-10; Exhibit 1, Orchin depo. trans, p. 84, lines 7-18.

30. When Orchin spoke to Great-West employee Jan Guthrie on January 18, 2010, the following verbal exchange took place:

**January 18, 2010 7:05 a.m. Jeremy Orchin to Jan Guthrie [all times MST]:**

**Jan Guthrie**: Good morning, Great West Life, this is Jan how can I help you?
**Jeremy Orchin**: Hi Jan, thank you very much, my name is Jeremy Orchin. I'm the trustee of a life insurance trust for a friend of mine and I think I need to clear up a discrepancy in billing. I haven't gotten a statement for the balance that was due in December. I think I've moved several times and I've put in a change of address but I'm not sure it's gotten through so I need some help to clarify this.

7

**JG**: Okay, I can certainly help you with that, what's the certificate number?
**JO**: The certificate number is 91130.
**JG**: Okay. Alright and the insured's name?
**JO**: Eugene Gadaire, G-A-D-A-I-R-E.
**JG**: Okay, now for privacy protection I do need to ask you a couple of security questions here.
**JO**: Sure.
[Guthrie asked Orchin for Dr. Gadaire's date of birth and dental school, Orchin provided]
**JG**: Okay. Thank you. You know, unfortunately this policy terminated July 1, 2009 because we did not receive payment. The address that we have on the system 2831 44th Street, NW.
**JO**: Yeah, that's, we moved. I thought there was an issue. I need to clear this up because I knew that I didn't get one in December.
**JG**: Okay.
**JO**: I need to, I'm the trustee, and I need to reinstate the policy because there was a miscommunication on addresses. Would anything have been sent out?
**JG**: Well…
**JO**: Because I didn't get anything.
**JG**: Okay, a bill would have been sent out in June for the July 1 renewal, and then since we did not receive payment within that 31 day grace period, by the end of July, a lapse notice would have been sent out.
**JO**: I did not receive any notices, that's my issue.
**JG**: Okay, did you send us or give us a call to change the address?
**JO**: No, I'm afraid that I neglected to do that because of my, it was two moves in six months and it was my fault and I need to know what I can do to reinstate this. I'm under a lot of pressure because I'm the trustee.
**JG**: Yes and I understand that. The only thing to get it, the only way to get his coverage back would be for him to submit an application and it's basically, he would have to re-apply. They would take a look at how he answers all the questions to determine whether he needs to go through the underwriting process. But chances are he probably will because it's been more than six months past the renewal of the last renewal. So what I can do is send you or give you our website and application. You can download the application and turn it over to him so that we can get this back in force for him but it is going to be a process.
**JO**: Is there someone else I can talk to that might have more influence because I'm feeling so guilty, I've been a trustee for 15 years and I've never let it slip and I don't want [him or them-*parties disagree*] to know that I did this. There must be a way that I can pay back the past monies or something.
**JG**: Unfortunately, this is the only way, I'm so sorry. It's been more than six months so this would be the only way to get the coverage back is for him to go through this process again.
**JO**: I can't, ay ay ay, I'm put in such a difficult situation because they have trusted me for so long. Is there some, there must be something, is there someone else that I can talk to that might be able to help me out, a supervisor or something. I understand you are helping as much as you can.

8

**JG**: Yes there is a supervisor here but they are going to be telling you exactly the same thing. You know, we are just real firm on this type of situation. I can appreciate your feelings and where you are coming from but this would be the only way to go ahead and get that coverage back for him.
**JO**: Ay ay ay, you're telling me if I talk to somebody else it's not going to make a difference. I would like to talk to somebody else just for my own well-being. Is that appropriate?
**JG**: I can see if there is anyone available. Hold on just a minute please.
**JO**: Okay, thank you.

Exhibit 7 at 1-3.

31. When Orchin first spoke to Great-West employee Nancy Fix on January 18, 2010, the following verbal exchange took place:

**January 18, 2010 at 7:12 a.m. Jeremy Orchin to Nancy Fix     (Transfer)**

**Nancy Fix**: Hi Mr. Orchin?
**Jeremy Orchin**: Yes.
**N**: Hi, this is Nancy.
**J**: Thanks for picking up the phone Nancy. I am in a terrible fix.
**N**: Okay.
**J**: I have been the trustee of his life insurance for 20 years and paying it every six months on time.
**N**: mm-hmm.
**J**: Over the last year I've moved twice, one of which was in May. It seems to me unbeknownst to me because of everything else that I did not receive a notice of payment for his premium.
**N**: Okay.
**J**: Now I'm settled in my new house I realize I didn't get one for December not knowing I didn't get one for July.
**N**: Right.
**J**: And if we look back I've paid everything on time and I'm the trustee of this estate and I just can't have it, let it lapse, I'm wondering if there is some way I can just pay back, I mean if there is a penalty or whatever to reinstate the existing conditions. I don't want them to know that I …
**N**: Right, I understand. Let me do this. We normally can have you fill out a re-application within six months of when the policy lapsed but it's been more than that so I have to get like a manager, a higher manager to approve this. Is there a phone number where I can give you a call back?
**J**: Yeah you bet, will it be today?
**N**: Yes, Mm-hmm.

9

>     [Orchin gave number to Fix]
>     **N**. Okay it's 7:15 here and the other manager doesn't even come in until about 9:30. So it will be probably 3 or 4 hours before we could have any kind of an answer but we'll certainly look at this and see what we can do.
>     **J**: Yeah, again if you look back at the past history it's never been late or missed and it was just an inadvertent moving of my part and the post office not sending it.
>     **N**: Sure.
>     **J**: I'm just so upset I can't believe it.
>     **N**: I understand, I do. Let me see what we can do. I'll give you a call back, you know, sometime today regardless of what we find out. Okay.
>     **J**: Okay thanks so much.
>     **N**: Alright thank you.
>     **J**: Bye.

Exhibit 7 at 4-5.


32. Great-West employees Jan Guthrie, Nancy Fix and Rochelle DeMills did not have knowledge of Dr. Gadaire's death when they handled the defaulted premium issue that Orchin brought to their attention on January 18, 2010 and allowed the terminated certificate to be reinstated. Exhibit 10, Guthrie Decl., ¶¶ 2, 4; Exhibit 11, Fix Decl., ¶¶ 4, 6; Exhibit 8, DeMills Decl., ¶¶ 3, 6.

33. Great-West employee Rochelle DeMills had the authority to make and made the discretionary decision on January 18, 2010 to allow Orchin to cure the defaulted premium issue he brought to Great-West's attention on that date and reinstate the terminated coverage. Exhibit 4, Goodreau Decl., ¶ 10; Exhibit 8, DeMills Decl., ¶¶ 3, 5.

34. If Great-West employee Rochelle DeMills had known that Dr. Gadaire was already deceased on January 18, 2010, she would not have allowed the defaulted

premiums to be paid and the insurance to be reinstated. Exhibit 8, DeMills Decl., ¶ 6; Exhibit 4, Goodreau Decl., ¶ 12.

35. Great-West first learned of the death of Dr. Gadaire from a call placed to it by Dr. Mark Tromblay on February 2, 2010. Exhibit 7 at 10; Exhibit 4, Goodreau Decl., ¶¶ 4, 9.

36. Great-West sent a claim form to Orchin which he signed on February 21, 2010 and sent to Great-West. Exhibit 2, GRTWST 496; Exhibit 4, Goodreau Decl., ¶ 13.

37. During review of Orchin's claim, Great-West employees determined that Dr. Gadaire had died three days before Orchin called on January 18, 2010 to report what he described as a billing and missed payments problem that he attributed to moving twice. Exhibit 2, GRTWST 496; Exhibit 4, Goodreau Decl., ¶¶ 2, 11-15.

38. Upon learning that Dr. Gadaire was deceased and the insurable loss had already occurred prior to the certificate's reinstatement on January 18, 2010, Great-West elected to void the reinstatement and deny Orchin's claim. Exhibit 4, Goodreau Decl., ¶ 15; Exhibit 2 at GRTWST 328-29.

39. Great-West tendered a premium refund to Orchin in connection with its denial. Exhibit 4, Goodreau Decl., ¶ 15; Exhibit 2 at GRTWST 328-29.