**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Jeremy D. Orchin, Trustee of the Eugene C. Gadaire Insurance Trust | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Case No. 1:12-cv-1743-BAH |
| Great-West Life & Annuity Insurance Company | ) ) ) | |
| Defendant | ) ) | |
| Elizabeth Gadaire | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | Case No. 1:13-cv-00055 (consolidated with above) |
| Jeremy D. Orchin, et al. | ) ) | |
| Defendants, et al | ) ) | |

**DEFENDANT GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF ORCHIN'S MOTION FOR SUMMARY JUDGMENT**

Defendant Great-West Life & Annuity Insurance Company (Great-West"), through counsel, submits this memorandum of points and authorities opposing the summary judgment motion filed by Plaintiff Jeremy Orchin ("Orchin").[1]

**I. Introduction**

This memorandum is accompanied by an additional exhibit and a short statement of genuine issues as contemplated by Local Civil Rule 7(h) to preserve what Great-West contends are incorrect fact statements made by Orchin, but those facts are ultimately immaterial and no genuine issues need to be further litigated. Great-West's statement of

---
[1] Orchin's summary judgment memorandum refers to him as a "cross-claimant."

genuine issues does not respond to a statement of material facts because Orchin's motion was filed without such a statement.[2]

## II. Analysis

**A. The District of Columbia claims are precluded**

At page 8 of his supporting memorandum, Orchin introduces six pages of arguments that roughly correspond to the first and fourth claims for relief in his Amended Complaint ("AC"). In those claims he invoked §31-4712(c)(2)(H) of the District of Columbia Insurance Code, applicable to certain kinds of policies, requiring notice to an insured for cancellations, and District municipal regulations which govern certain kinds of policies, claiming §26-A301.2-5 thereof requires, *inter alia*, notice of cancellation to an insured and to the District's Insurance Commissioner for cancellation to be effective. His memorandum tracks the faulty premise he pleaded—that the Illinois choice of law provision in the insurance certificate means that both Illinois and District of Columbia law applies. He concludes that since Illinois does not have laws like the statute and regulation he favors, the District's laws apply, and he cites as support a case that generally addresses the freedom of states to regulate deceptive trade practices.

Orchin's "dual governing law" assertion is wrong, as shown at pages 12-15 of Great-West's summary judgment supporting memorandum. District of Columbia law honors choice of law provisions in group insurance contracts which "govern as long as there is some reasonable relationship with the state specified." *Whiting v. AARP*, 637 F.3d 355, 361 (D.C. Cir. 2011) (association group health insurance; internal quotations and citation omitted). The case *King v. Liberty Life Assurance Co. of Boston*, 806

---

[2] Great-West occasionally references herein its own motion for summary judgment and the memorandum filed in support thereof, ECF 31 *et. seq.*

F.Supp.2d 25, 29 (D.D.C. 2011), followed *Whiting* and stated that choice of law provisions are also enforced when applicability is conceded.  Orchin admits the certificate's Illinois choice of law provision applies but incorrectly argues about what it means.  It means his first and fourth claims for relief are precluded by Illinois law.

Orchin's District of Columbia law claims also have no merit.  This is addressed at pages 16-17 of Great-West's supporting memorandum.  Orchin incorrectly equates this insurance termination due to his failure to pay the premium with a unilateral termination by Great-West.  The certificate did not contemplate unilateral termination by Great-West, and the definitions section of the municipal regulation confirms that cancellation is instead an "insurer's termination, or attempted termination, of the effectiveness of a policy before the end of the policy period." DCMR § 26-A399.1.

Orchin's confusing "structural changes" discussion at pages 3-4 and 10 of his supporting memorandum tries to avoid the express acknowledgement in D.C. Code § 31-4712(h)(2) that the statute he relies upon for his first claim for relief is inapplicable to life insurance.  He argues that the certificate at issue is not really "life insurance" because it is also "accident" and "disability" insurance.  The "accident" insurance he refers to is an option elected by Dr. Gadaire that would have paid an additional benefit if the insurance were in place and he had died from an accidental rather than a natural cause. Often called "double indemnity," under this group plan the benefit was available in variable increments.  *See* Exh. 3 to Great-West motion at GRTWST 26-27.  This was a life insurance benefit activated by the "insured person's death" and cannot be fairly portrayed as some sort of non-descript "accident" insurance.  *Id*. at 26.  Similarly, the "disability" insurance Orchin refers to is the option Dr. Gadaire elected that would have allowed his

premiums to be waived if he had become totally disabled, and obviously those were the premiums for his <u>life insurance</u> based upon his total units of coverage in force.  *Id.*, GRTWST 28-31.  Orchin's analysis is frivolous.[3]

At pages 12-14 of his supporting memorandum, Orchin asserts a "failure to honor written agreement to extend time for payment of premiums" claim based upon §31-4706 of the District's Insurance Code.  This new claim, precluded by the certificate's Illinois choice of law provision, was never pleaded.  Orchin's benefit claim was originally denied on March 19, 2010 and he was told why.  *See* Exh. 2 to Great-West's motion at GRTWST 328-29.  His AC was filed on March 13, 2014. This statute is not referenced in his AC and "[i]t is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing." *District of Columbia v. Barrie*, 741 F.Supp.2d 250, 263-64 (D.D.C. 2010); *see also Sloan v. Juergens*, 652 F.Supp.2d 51, 62-63 (D.D.C. 2009); *DSMC, Inc. v. Convera Corp.*, 479 F.Supp.2d 68, 84 (D.D.C. 2007).

If the Court were to evaluate this claim on its merits, it adds nothing to the analysis. The ability of life insurance companies to enter into agreements under District of Columbia law to extend the time for premium payments creates no rights for Orchin. Nobody claims Great-West lacked authority to consider reinstatement and agreed to do so, the issue is whether Dr. Gadaire's prior death, known to Orchin but unknown to Great-West, voids the reinstatement because of Great-West's lack of knowledge that the insurable loss had already occurred and, independently, due to how Orchin presented the post-death reinstatement topic to Great-West coupled with its lack of knowledge.  An

---

[3] As mentioned in fn. 7 at p. 15 of Great-West's supporting memorandum, Orchin unnecessarily raised notice to an insurance agent in connection with his fourth claim for relief but pleaded nothing regarding an agent since this insurance was not sold through an agent.  His "failure to notify agent" comment on p. 12 of his supporting memorandum is immaterial.

inapplicable statute does not determine if Orchin can force Great-West to honor the reinstatement on these facts.  He is not entitled to summary judgment on either the first or fourth claim for relief pleaded in his AC or his new, never-pleaded claim.

**B.  The claim that termination of insurance was ineffective because Great-West breached the trust agreement is meritless**

Orchin's third and fifth claims for relief challenge the insurance termination effective July 1, 2009 by claiming Great-West failed to send duplicate premium notices to Dr. Gadaire after his 1993 assignment of all of his rights in the insurance certificate and suggest this would have prevented termination.  The third claim invokes insurance certificate language, whereas the fifth claim invokes trust agreement language.  Orchin's supporting memorandum does not discuss any facts or offer any analysis regarding his third claim and thus he does not seek summary judgment on that claim.  The arguments he raises at pages 17-18 of his memorandum correspond roughly to his fifth claim addressed at pages 19-23 of Great-West's supporting memorandum.

Great-West disputes receiving a copy of the trust agreement prior to when the death claim was submitted but for summary judgment purposes has treated the document as having been sent to it in 1993.[4]  To support his argument, Orchin restructures the assignment agreement itself, Exh. 2 to Great-West's motion at GRTWST 108, describing it in ¶ 5 of his declaration as "Great-West's assignment of the insurance policy to the Trust," and at pages 16 and 17 of his memorandum he portrays the assignment as an affirmative act proving Great-West's acceptance of the trust document terms.  He argues:

> [Great-West] agreed to its obligations described in the Trust, which [Great-West] accepted by assigning the Insurance Policy to the Trust and

---

[4] Orchin states in ¶ 3 of his declaration that Dr. Gadaire sent the trust document to Great-West, whereas in an affidavit submitted during an appeal of Great-West's claim denial, Mrs. Gadaire, the other plaintiff, claims to have sent it in.  *See* Exh. 2 to Great-West's motion at GRTWST 196.

5

> continuously accepting premium payments, thereby creating a contractual Assignment Agreement between [Great-West], Dr. Gadaire, and the Trust.
>
> ***
>
> …After receiving the Trust Agreement, however, [Great-West] assigned the policy and readily accepted the future premium payments, thereby providing its assent to all the offered terms and conditions.

This assertion is wrong. Great-West was not a party to the assignment, instead its role after receiving it was to record and honor it, expressly declining any responsibility for its "validity or effect" per certificate language quoted by Orchin at page 17 of his supporting memorandum and in the assignment document itself. *See* Great-West's Exh. 2 at GRTWST 108.[5] The assignment was executed by Dr. Gadaire and transferred ownership rights to Orchin as trustee. It is silly to contend Great-West is the real "assignor," and to call this misconception an "act of acceptance" of the trust document's terms. It is also silly for Orchin, referred to in the assignment as the "assignee," to erase himself from the assignment transaction entirely. *Id*. This restructuring cannot overcome how the trust document, Exh. 12 to Great-West's motion, does not pretend to make Great-West a party to it and was not executed by Great-West. It did not purport to say that "receiving it" with an assignment would serve to "adopt" its terms.[6] Nor does this overcome what Great-West established at pages 22-23 of its supporting memorandum—Orchin and Dr.

---

[5] Orchin contorts the "Great-West is not responsible for the validity or effect of any assignment" language as "not preclud[ing] [Great-West] from entering into subsequent agreements in order to effectuate that assignment" immediately after he quotes it. Parties can do many things, but he does not explain why a party with no responsibility for the validity or effect of an assignment would enter into "subsequent agreements" in order "to effectuate" the assignment. Portraying the trust document as a "subsequent agreement" entered into by Great-West also contradicts Orchin's characterization at page 16 of his supporting memorandum of the terms of the trust agreement being accepted by Great-West <u>by</u> its supposed "assignment" of the certificate.

[6] The assignment document does not incorporate the trust document and the trust document does not incorporate the assignment document. *Compare* Great-West's summary judgment Exh. 2, GRTWST 108, and Exh. 12 thereto.

Gadaire never performed as though duplicate premium notices were in play, and it is improper for Orchin to resurrect this long-ago waived "right" against Great-West.[7]

The declaration Orchin filed with his summary judgment motion asserts that duplicate premium notices sent to Dr. Gadaire were a "critical" part of the trust's "structure." Orchin Decl., ¶¶ 2, 6-7. He misleadingly argues about how he now insists things *should have been handled* to both bolster this "breach" claim against Great-West while erasing his role in the certificate's termination, stating at page 18 of his memorandum that Great-West's alleged "failure to provide Dr. Gadaire the contractually required premium notices is directly responsible for the failure to timely remit the premium payments into the Trust checking account, thereby causing the Trust to have insufficient funds to make the required payments." He suggests his hands were tied by a lack of funds and falsely portrays how he and the Gadaires actually handled premium payments. In his deposition he admitted he was always the sole party who received notices, was comfortable with the process, and the process from 1993 forward always commenced with him contacting the Gadaire's after he alone received a premium notice:

> **Q**. Now, was it part of your responsibilities to forward payments to Great-West?
> **A**. Yes.
> **Q**. And when did that responsibility begin?
> **A**. 1993.
> **Q**. How did you go about fulfilling that responsibility?
> **A**. When a statement was received, I would call Mrs. Gadaire and tell her that a six-month premium was due. And she would deposit money in the trust's checking account and I would write a check to Great-West.
> **Q**. And was that your normal practice?
> **A**. What do you mean?

---

[7] At page 2 of his supporting memorandum Orchin referenced the assignment and the trust document and said "Defendant accepted these documents and agreed to continue coverage…," citing Great-West's answer to ¶ 12 of his AC as "evidence" that Great-West admits receiving the trust document in 1993. His ¶ 12 of his AC said nothing about the trust document being sent to Great-West, thus he has cited no evidence supportive of his statement.

7

> **Q**. Of calling—of getting the invoice, calling her, asking her to put money in the account and then she would put money in the account and then you would pay the invoice?
> **A**. Yes.
> **Q**. Was that always your normal practice with respect to payments to Great-West?
> **A**. Yes.
> **Q**. Before that practice began did you have a discussion with either Mr. or Mrs. Gadaire as to why you would operate the payments for the trust in that manner?
> **A**. I assume so. Do I—yes.
> **Q**. Would you have had that discussion with Mrs. Gadaire or with Dr. Gadaire?
> **A**. Probably both of them.
> **Q**. And you were comfortable with a situation in which you would simply give them the invoice every six months and ask them to put money in the account so you could pay it?
> **A**. That's—that's what I did, so I assume I was comfortable with it.

Exh. 1 to Great-West's motion, p. 18, line 1—p. 19, line 14.

Affidavits and declarations that contradict deposition testimony without plausible explanation and for the purpose of thwarting summary judgment are improper. *Davis v. The George Washington University*, ___ F.Supp.2d __, 2014 WL 1100232 *12 (D.D.C. 2014) (citing circuit and district court authorities). Although Orchin's declaration is in support of his own motion, the rule applies equally in this situation because he is rewriting history and contradicting his testimony to gain a summary judgment advantage. His declaration is a disguised legal argument that confuses how things might have been with how they actually were. For example if, as Orchin now states, duplicate notices sent to Dr. Gadaire were "critical," then the premium payment process would not have hinged on him contacting the Gadaires. Things were as they were because neither Orchin nor Dr. Gadaire asked Great-West to send duplicate notices to anyone. *See* Great-West's supporting memorandum at 19, 21-22.

It is facetious for Orchin to now portray Great-West's sending of duplicate notices as "critical" and a "deal breaker"[8] given his deposition admission that duplicate notices were <u>never</u> utilized and given the undisputed fact that nobody ever contacted Great-West to report or complain that Dr. Gadiare was not receiving notices. *See* Great-West's motion, Exh. 4, Goodreau Decl.,¶¶ 17-18.  Further still, and assuming that Gadaire submitted the trust agreement to Great-West, Orchin and Gadaire concede that under their scenario that agreement would not have been sent to Great-West until a month after it was executed by Orchin. *See* Exhibit 2 to Great-West's Motion for Summary Judgment, GRTWST 196. For him to now argue that his acceptance of the role of trustee was contingent on Great-West's future possible acceptance of the trust terms is illogical, and if nothing else barred by the parol evidence rule. *Bolling Federal Credit Union v. Cumis Ins. Society, Inc.*, 475 A.2d 382, 385 (D.C. 1984) (Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous.) Orchin's execution of the trust agreement bound him to the plain meaning of terms of that agreement – not Great-West.

Orchin's theory that termination of insurance was ineffective because Great-West failed to send duplicate premium notices is derived from a belated review of the 1993 trust document, recognition that perhaps the parties thereto could have done things differently, and a desperate attempt to assign non-existent duties to Great-West in hindsight. Although Orchin's communications with Great-West on January 18, 2010

---

[8] In paragraph 4 of his declaration he now claims "[i]f Great-West refused or in any way objected to providing notices to both myself and Dr. Gadaire, I would not have accepted the assignment of the insurance policy to the Trust."

were tainted by his fraud, he was right about why the certificate terminated, which he then readily took responsibility for:

> **JO**: I did not receive any notices, that's my issue.
> **JG**: Okay, did you send us or give us a call to change the address?
> **JO**: No, I'm afraid that I neglected to do that because of my, it was two moves in six months and it was my fault and I need to know what I can do to reinstate this. I'm under a lot of pressure because I'm the trustee.

Great-West's motion, Exh. 7 at 2.[9] Nothing was uttered about any supposed failure by the Gadaires to fund the trust account or any failure to send duplicate notices.

The "Great-West breached the trust document" theory is unavailable to Orchin because Great-West was not a party to the trust agreement, the trust agreement imposed no duties on Great-West, the parties to the trust, Dr, Gadaire and Orchin, never acted to implement any "duplicate notices" procedures, and a claimed breach dating back to 1993 was waived and cannot be resurrected in this lawsuit. Orchin is not entitled to summary judgment on his "breach of trust document" claim which is his fifth claim for relief.

At pages 14-16 of his supporting memorandum, Orchin argues that Great-West's exercise of discretion to accept the defaulted premiums operated to reinstate the original certificate, which is not in dispute, and concludes that "[t]here being no District of Columbia or Illinois statute or Insurance Policy provision that precludes reinstatement after death or otherwise requires proof of insurability for reinstatement, [Great-West] is contractually bound by its decision to reinstate the policy." Like his other arguments, Orchin does not tie this argument to any particular claim for relief but it does not

---

[9] Great-West disputes that Orchin did not receive the premium and lapse/reinstatement notices but established their mailing at pages 35-37 of its supporting memorandum and his denial of receipt is immaterial.

matter.[10]  His District of Columbia law reference is superfluous, and the fundamental requirement that a living person exists at the time of a reinstatement of life insurance has been a feature of Illinois common law for at least well over a century.  *See* Great-West's supporting memorandum at 23-25.  An insurer can waive this requirement, but only if it has what Orchin had at the time he sought reinstatement--knowledge that the insurable loss has already occurred.   Great-West's undisputed lack of knowledge allows it to void the acceptance of defaulted premium/reinstatement transaction without regard to Orchin's scienter when he sought reinstatement, but his fraudulent representations to Great-West that Dr. Gadaire was alive at the time reinstatement was permitted serves as a separate ground for Great-West to void the transaction.  *Id*. at 25-32.

   The elephant in the room, Orchin contacting Great-West seeking reinstatement of life insurance more than six months after it terminated and three days after the former insured died, is barely perceptible from his memorandum.  He broached the issue briefly in his footnote 5 on page 15, citing inapplicable District of Columbia law for the proposition that it is Great-West's burden to prove a misrepresentation in an application

---

[10]   Orchin weaved in his "Great-West has no right to care" notion at page 15, stating Great-West employee Rochelle DeMills knew Dr. Gadaire had been previously found ineligible in 2007 for new insurance due to "a serious heart condition." DeMills indisputably knew Dr. Gadaire had been declined, but she testified at pages 21 and 35-36 of her deposition, Exh. 12 to Orchin's motion, that she did not know the exact nature of his condition, only that it was a health-based decline, the details of which she would not have then investigated. Heart conditions in general have life insurance underwriting consequences, but Orchin has presented no evidence that Dr. Gadaire was in an "obvious near death" state of health already in 2007 which is the conclusion he wants drawn.  When Dr. Gadaire's application for new insurance was rejected by Great-West, he sought reconsideration and his doctor stated in a letter that he "is one of the most fit individuals in my practice….[and] he would be an excellent candidate for your best rates for term life." Great-West's Exh. 13, submitted herewith. It is immaterial and unnecessary to decide the precise "seriousness" of Dr. Gadaire's health condition in 2007 because he was alive then and was understood by Great-West to be alive on January 18, 2010 when DeMills was evaluating whether to allow reinstatement. Great-West's motion, Exh. 8, DeMills. Decl., ¶ 6; Exh. 10, Guthrie Decl., ¶ 4; Exh. 11, Fix Decl., ¶ 6.  The actual cause of his death, which Great-West agrees was heart-related even though Orchin has offered no evidence in that regard, is also immaterial.

misrepresentation situation, and claiming he provided "genuine responses" to Great-West's requests. On the fraud prong, this is not application misrepresentation by an insured, instead fraudulent inducement by a non-insured owner, but Great-West has the burden under Illinois law to establish Orchin's fraud. It is unnecessary for Great-West to prove fraud to void reinstatement, but Great-West believes it has established his fraud as a matter of law. His claim to providing "genuine responses" ignores how he represented Dr. Gadaire as alive when he contacted Great-West seeking reinstatement and he should not be allowed to enforce reinstatement under these circumstances.

### III. Conclusion

If the termination of insurance effective July 1, 2009 was truly unplanned, Orchin cannot make Great-West the scapegoat for the termination by manufacturing notice requirements from inapplicable District of Columbia law, or by belatedly assigning it a "duty" from a trust document it was not a party to, and a "duty" that even the real parties to the agreement abandoned from the start. Orchin's summary judgment motion should be denied.

Respectfully submitted,

    / s / Matthew J. Youssef
Craig D. Roswell, Esquire #433406
Matthew J. Youssef, Esquire #MD17910
NILES, BARTON & WILMER, LLP
111 South Calvert Street, Suite 1400
Baltimore, Maryland 21202
(410) 783-6300 *telephone*
(410) 783-6363 *facsimile*
cdroswell@nilesbarton.com
mjyoussef@nilesbarton.com
*Counsel for Defendant,*
*Great-West Life & Annuity Insurance Co.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of July, a copy of the Defendant Great-West's Memorandum in Opposition to Orchin's Motion for Summary Judgment was served by the electronic filing of this pleading to all counsel entered in this matter pursuant to LCvR 5.4(d).

/ s / Matthew J. Youssef
Matthew J. Youssef

4810-7980-4444, v. 1