**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

Jeremy D. Orchin, Trustee of the Eugene C.    )
Gadaire Insurance Trust    )
    )
Plaintiff    )
    )
v.    )    Case No. 1:12-cv-1743-BAH
    )
Great-West Life & Annuity Insurance Company    )
    )
Defendant    )
——————————————————— )
    )
Elizabeth Gadaire    )
    )
Plaintiff    )
    )
v.    )    Case No. 1:13-cv-00055
    )    (consolidated with above)
Jeremy D. Orchin, et al.    )
    )
Defendants, et al    )
——————————————————— )

**DEFENDANT GREAT-WEST'S REPLY TO PLAINTIFFS' JOINT
OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT**

    Defendant Great-West Life & Annuity Insurance Company (Great-West"), through

counsel, submits this reply memorandum in support of its motion for summary judgment

to address the joint opposition ("Opposition") and related submissions filed by plaintiff's

Jeremy Orchin ("Orchin") and Elizabeth Gadaire ("Gadaire").  This reply addresses the

Opposition's topics largely in the order raised therein.

    **I.**    **The Response To Great-West's Statement Of Material Facts Is Defective**

    First, Great-West filed a statement of material facts, in conformance with Local

Rule 7(h), listing 39 items it considers undisputed, each supported with citations to

evidence or pleadings. [Ecf. 31-2].  An opponent should admit or deny those facts, also

with support when applicable, but not present different facts.  Orchin and Gadaire filed an opposing statement presenting different facts they prefer to address. [Ecf. 39-1].  They thereby avoided admitting or denying the facts relied upon by Great-West.  Great-West accordingly requests that its entire statement of material facts be accepted as true.

Great-West believes the defective opposing statement of material facts submitted by Orchin and Gadaire does not warrant a detailed response.  However, to the extent resolution of the motion is aided, Great-West accepts, for purposes of summary judgment, all facts set forth in their list of numbered items 1-14 at pages 1-2 except for:

> **Item 6**. It is undisputed that Orchin did not pay the premium due on July 1, 2009, confirmed thereafter in item 13 of Orchin's and Gadaire's statement.

> **Item 11**. Although it is agreed that Great-West employees did not expressly inquire of Orchin as to whether Dr. Gadaire was alive or deceased, Orchin's representation of Dr. Gadaire as a living person obviated any such inquiry, and certificate language informed Orchin that failure to pay premiums resulted in termination. Great-West's Exhs. 7 and 3 at GRTWST 17.

Regarding the eight numbered "genuine issues" set forth at page 3 of their opposing statement that Orchin and Gadaire claim, without support, are in dispute, Great-West disagrees with the following items:

> **Item 4**.  Although Orchin denies receipt of the premium due notice, Exhibit 5 to Great-West's motion, his denial does not create a genuine fact dispute.

> **Item 5**.  Partially disputed, because although whether Great-West was <u>required</u> to send any notice to Dr. Gadaire is disputed, it is undisputed that Great-West did <u>not</u> send a notice to him.

> **Item 6.**  Partially disputed, because it is undisputed that Great-West did <u>not</u> send a notice to Dr. Gadaire.

> **Item 7**.  Although Orchin disputes receipt, Great-West sent him the lapse/reinstatement notice, Exhibit 6 to Great-West's motion, and his denial of receipt does not create a fact dispute; and it is undisputed that Great-West did <u>not</u> send a notice to Dr. Gadaire.

Failure to oppose arguments raised in support of summary judgment should be treated as conceding the argument. *See, e.g., Sloan v. Urban Title Services, Inc.*, 689 F.Supp.2d 94, 121-22 (D.D.C. 2010) (collecting cases). Great-West addressed Orchin's denial of receipt of the notices at pages 35-37 of its supporting memorandum with evidence that proves mailing.   Other than renewed denials of receipt in the defective opposing statement of facts, Orchin and Gadaire offered no analysis or evidence on that topic, except at page 15 where the Opposition states "[t]he lapse notice informed Orchin that coverage was about to be terminated." This false portrayal of the notice's language is either an admission that Orchin received the lapse/termination notice or an admission it is effective notice because proof of mailing is established. Regardless, the notices should be deemed sent due to no challenge offered by Orchin and Gadaire and because items 14-15 and 23-24 in Great-West's statement of material facts were not properly opposed.

## II.     Illinois Law Governs

### A.  Orchin and Gadaire already admitted Illinois law applies

The Opposition inaccurately suggests at page 2 that Great-West raised the application of Illinois law as an "alternative" argument.  As shown at pages 12-15 of Great-West's supporting memorandum, and the positions raised thereafter, all of Great-West's positions are based on Illinois law.[1] The individual certificate clearly states:

> At the request of the [American Dental] Association, which is headquartered in Chicago, Illinois, and with the agreement of the Company, the Policy and any dispute between an insured person or claimant and the Company arising in connection therewith are subject to, governed by, and shall be construed in accordance with the law of the State of Illinois, and this Policy has accordingly been

---

[1] Great-West also pointed out at pages 16-17 of its supporting memorandum that the claims based upon District of Columbia law fail on their merits even if District law were applicable.

> submitted to and approved by the Illinois Department of
> Insurance.
>
> The Policy is sitused in the State of Illinois, and is amended
> to comply at all times with the minimum requirements of
> the State of Illinois, which apply to the Group Term Life
> Insurance.
>
> The Policy and individual Certificates issued are deemed to
> be issued in the State of Illinois.

Great-West's Exh. 3 at GRTWST 24.

The Opposition now insists that only District of Columbia law applies and argues in a heading at page 3 that application of District law is "dictated" by the first claims for relief pleaded in the Amended Complaints ("ACs").  Illinois choice of law language in the insurance certificate issued to Dr. Gadaire, not party allegations, determines the choice of law and it effectively invokes Illinois law.  The Opposition does not challenge the scope of the language, and does not directly acknowledge its existence at all.[2]

Orchin and Gadaire cannot renounce their pleadings to escape summary judgment. "It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing." *District of Columbia v. Barrie*, 741 F.Supp.2d 250, 263-64 (D.D.C. 2010); *see also Sloan v. Juergens*, 652 F.Supp.2d 51, 62-63 (D.D.C. 2009). Both ACs expressly pleaded, and thus admitted, the existence of the certificate's Illinois choice of law provision <u>and</u> that it governs.  Orchin's AC, ¶ 53-54; Gadaire's AC, ¶ 39-40.  Orchin's and Gadiare's <u>expressly pleaded</u> choice of law analysis incorrectly pleaded that the provision invokes the combined laws of Illinois and the District of

---

[2] At page 4 the Opposition refers to the contractual provision as a "forum selection clause," but the provision does not select any particular court or jurisdiction where a lawsuit must be brought.

Columbia, but that incorrect legal conclusion does not change their admission that the provision applies. *Id.*

The ACs do serve as places where issues have been admitted. By expressly pleading that the choice of law language exists and Illinois law applies, albeit under the mistaken notion that it applies "jointly" with District of Columbia law, Orchin and Gadaire are precluded from asserting that Illinois law does not apply, and precluded from asserting that this is not group insurance and that there are insufficient contacts between the group plan and Illinois. The Court need only decide whether Illinois law or the "combined laws," apply, and since the latter notion negates the choice of law provision entirely, the Court should decide the former.

**B. Orchin and Gadaire already admitted that a group insurance policy in involved**

To the extent the Court entertains the substance of the Opposition's attempt to renounce Illinois law, at page 4 the Opposition concedes that group insurance policies may contain a choice of law provision, citing the *Whiting* case. However, the Opposition then implies that the present case involves "just" a life insurance policy.[3]

*Whiting* involved group insurance. The fact that the certificate at bar was issued under a <u>group</u> life insurance policy, and thus squarely within the holding of *Whiting*, is established by language in the insurance certificate. Great-West's Exh. 3 at GRTWST 1.[4]

---

[3] The Opposition suggests at page 4 that *Whiting* only applies to group health insurance contracts, but nothing in *Whiting* suggests that enforcement of a choice of law provision in a group insurance policy depends upon the particular risk insured.

[4] The Opposition suggests at page 4 that the insurance in *Whiting* is subject to a "lower jurisdictional bar" because it is a "widely available group plan, which by its nature offers broadly available benefits across the country." Orchin and Gadaire concede that a large group plan can contain an enforceable choice of law provision. Although they ignore the group insurance aspect of the American Dental Association ("ADA") group plan, they may be suggesting it is too small

It is also proven by <u>specific allegations</u> in Orchin's and Gadaire's ACs, although they incorrectly stated Dr. Gadaire purchased a "group policy" instead of a certificate issued pursuant to a group policy.  Orchin's AC, ¶¶ 7-9; Gadaire's AC, ¶¶ 6-7.  Orchin's and Gadaire's joint opposing statement of material facts, defects aside, states in the first item that "a group life insurance plan sponsored by the American Dental Association" is at issue.  And the Opposition itself concedes on page 3 that group insurance is at issue.

Orchin and Gadaire repeatedly admitted Illinois law applies, repeatedly admitted this is group insurance, admit that group insurance policy choice of law provisions are enforceable, and their contradictory and frivolous maneuvers to escape what has been long and repeatedly agreed upon is improper.[5]

### C. The reasonable relationship required by *Whiting* indisputably exists

*Whiting* found that where the sponsoring group insurance entity is based establishes the required "reasonable relationship" if that law is selected in a contractual choice of law provision. 637 F.3d at 361. There is no dispute that the ADA is sitused in Chicago, Illinois, as confirmed by the language in the choice of law provision and as Orchin expressly pleaded in ¶10 of his AC.  Illinois substantive law governs this case.

### III.    No Genuine Issues of Fact Prevent Entry Of Summary Judgment As To The Second Claims For Relief

### A. The lack of knowledge/ineffective waiver of termination issue allows Great-West to retract/void the reinstatement

---

to qualify for the "lower jurisdictional bar." As shown in ¶ 1 of Exhibit 4 to Great-West's motion, this ADA plan insures more than 90,000 lives, easily satisfying their "lower jurisdictional bar."

[5] At page 5 the Opposition argues that the District of Columbia has an interest in protecting Orchin's and Gadaire's interests by stating that Illinois law disfavors forfeitures of insurance and the District also does.  Perceived similarities between Illinois and District law adds nothing to the choice of law analysis and is not a reason to elevate one source above the other.

The heading at page 6 of the Opposition insists that there are fact disputes preventing summary judgment as to the second claims for relief, addressed in detail at pages 23-32 of Great-West's supporting memorandum.   The Opposition then insists that "policy" ambiguities should be construed against Great-West, but without identifying any claimed ambiguities. Great-West agrees that insurance contract ambiguities are generally construed in favor of insureds if reasonable conflicting interpretations exist.   However, inapplicable principles of law do not impact the availability of summary judgment.

Great-West explained at pages 23-32 of its supporting memorandum that it is entitled to summary judgment on the second claims for relief for two separate reasons. First, because it is entitled to void the reinstatement it agreed to without knowledge that the insured, Dr. Gadaire, was already deceased, and second, because Orchin defrauded Great-West's employees by representing Dr. Gadaire to be a living person when he sought reinstatement of the insurance three days after Dr. Gadaire's death.   The Opposition cites principles of fraud law from both District of Columbia and Illinois cases at pages 6-8, but waits until pages 18-19 to address the lack of knowledge/ineffective waiver of termination issue analyzed in the *Van Hulle* decision quoted and discussed at pages 24-25 of Great-West's supporting memorandum.   Great-West will analyze the lack of knowledge/ineffective waiver of termination issue before analyzing Orchin's fraud.

The Opposition distorts language from the *Van Hulle* decision to insist the holding applies only to "implied waiver" situations and then falsely argues that Great-West is portraying this as an "implied waiver" situation.   There is no dispute that Great-West made an express waiver of the certificate's termination when it communicated with

Orchin on January 18, 2010.   However, the insurable loss, Dr. Gadaire's death, had already occurred, and, unlike Orchin, Great-West had no knowledge of the loss.

The Opposition's distinction between implied and express waiver situations is wrong. The *Van Hulle* Court pointed out that typically when an insurer has "waived" or "forgiven" an insurance termination, the focus is on acceptance of an overdue premium and who knew what and when in connection with the acceptance.   As the court observed, "[g]enerally the waiver is not expressed or intentional, but rather it is implied from the conduct of the insurer or its agents."   44 Ill.2d at 230, 254 N.E.2d at 460.   This observation simply states the obvious; rarely would someone contact an insurer to request reinstatement of terminated life insurance after the death of the former insured, pretending he is still alive.   However, *Van Hulle* does not suggest that an express waiver, which is simply easier to prove, cloaks the party who obtained it from the insurer with "immunity" from the insurer revoking the waiver upon discovery of the truth.   The rules in *Van Hulle* govern regardless of the nature of the insurer's waiver of termination.

As stated in *Miller*, quoted at page 23 of Great-West's supporting memorandum, "a renewal contract of insurance necessarily requires the continued existence of that which is insured."   An insurer is not prevented from allowing termination to be cured in an intervening death situation, but as recognized in *Miller* and elaborated upon in *Van Hulle*, the insurer's waiver is only enforceable/binding against it if it acted with <u>knowledge</u> of the intervening loss.   Knowledge makes waiver effective. It may be actual or imputed, but it is not an "optional" element.   If neither the party requesting reinstatement nor the insurer knew of the loss, the insurer's lack of knowledge allows it to revoke waiver of termination upon discovery of the truth. If the requesting party knew of the intervening

loss and failed to share that crucial information with the insurer, they run afoul of the further admonition in *Van Hulle* that "to constitute waiver an intent to get retroactive coverage must be communicated to the insurer." 44 Ill.2d at 232, 254 N.E.2d at 461.[6]

If the party trying to enforce the insurer's waiver of termination against the insurer knew of the intervening loss of the very object of the insurance, they do not have the argument available to them, as Orchin pretends, that somehow Dr. Gadaire's death just didn't seem important and it just "didn't come up" in his communications with Great-West. A party armed with that superior knowledge cannot keep that information to himself but must affirmatively disclose that retroactive coverage for a loss already incurred is being sought. Orchin's "it just didn't come up" facade simply means he failed to make the disclosure required both by common sense and by the holding in *Van Hulle*.

Being coy with Great-West was not an option for Orchin given that he was seeking reinstatement fully aware of Dr. Gadaire's death.   It is unnecessary for the Court to reach and analyze Orchin's fraud because Great-West indisputably acted without knowledge. Orchin's knowledge and disclosure failure simply makes this determination even easier.

At page 19 the Opposition argues that Great-West was on "inquiry notice."   The gist is that Great-West knew in 2007 that Dr. Gadaire had a heart condition and was not in perfect health, and therefore it is "at fault" for letting Orchin reinstate.   Great-West addressed this in footnote 10 on page 11 of its opposition to Orchin's motion for summary judgment and submitted its Exhibit 13 which shows that Dr. Gadaire and his

---

[6] This involves an assessment of waiver on two levels. First, there is some act by the insurer that waives the termination/forfeiture of the insurance.  Since Great-West expressly told Orchin it would reinstate the insurance and let him pay the premium, there is no dispute Great-West initially waived termination.  Second, if Great-West acted with knowledge of the intervening loss, whether actual or imputed knowledge, then it would be deemed to have waived the right to revoke its decision to waive the termination of the insurance.

treating physician insisted in 2007 that his condition was relatively minor, but there is no dispute he had a condition that Great-West viewed as having underwriting consequences.

As Great-West stated at page 35 of its supporting memorandum, there is a fundamental difference between agreeing to insure a risk, and agreeing to insure a known loss, which presents a certainty.  A party who withholds what any reasonable person knows is objectively important information cannot complain that he was inadequately cross-examined, and *Miller* states that a waiver "is not to be presupposed from a purely negligent act or one done under misapprehension of the real condition of the rights of the parties at the time."  1884 WL 9854 *3 (Ill. 1884).  Arguing that Dr. Gadaire's health was imperfect in 2007, or faulting Great-West for trusting Orchin, are not substitutes for knowledge of the loss required to bind Great-West to the reinstatement.

Summary judgment on the second claims for relief should be entered. Great-West's indisputable lack of knowledge of Dr. Gadaire's death when it agreed to waive termination of the insurance allowed it to retract reinstatement upon learning the truth.

**B. Orchin's fraud allows Great-West to retract/void the reinstatement**

At pages 6-7 the Opposition cites District of Columbia cases and argues that fraud consists of five elements, then references reasonable reliance and says it is six elements. At page 8 the Opposition offers the general statement that "[n]on-disclosure can be a source of fraud only if there is a duty to speak" and cites a District of Columbia case.[7] The Opposition ultimately insists that because there is one place in the transcript of Orchin's telephone calls with Great-West employees where he disputes whether the word

---

[7] Great-West agrees that applicable Illinois cases have, in fact-specific situations, also referenced this general principle.

"him," meaning Dr. Gadaire, was used, versus the word "them," meaning he *might* have been referring to others, summary judgment is precluded.

The Opposition avoids the elements of a fraudulent inducement claim discussed at page 30 of Great-West's supporting memorandum. Great-West must prove that Orchin made a false representation of a material fact, knowing or believing it was false, for the purpose of inducing Great-West to act. This is not a "no duty to speak" situation because Orchin spoke. Illinois cases cited at page 30 of Great-West's memorandum hold that if a party accused of a fraud contributed to a misapprehension of the truth by the other party and knows the other party is treating that misapprehension as the truth, they then have a duty to clarify. Great-West also pointed out that this rule should apply especially when the party accused affirmatively created the misapprehension with faulty statements as opposed to the other party being a bad listener.

After pretending this might be a "no duty to speak" situation, the Opposition implies that Great-West should not have relied upon Orchin's statement that he was calling regarding insurance he owned "for a friend of mine." At page 8 the Opposition suggests it would have been "unnatural" for Orchin to have spoken in a manner that would have clarified that his "friend" did not exist. For the sake of argument, it is objectively noncommittal for anyone to refer to a deceased person as "a friend" without qualifiers such as "former friend," "used to be my friend," etc. Referring to a deceased person the same way one refers to a living person is, under any application of the concept, contributing to the listener reasonably believing them to be alive. Thus, Orchin undeniably contributed to Great-West's employees understanding Dr. Gadaire to be alive.

If a person is evasive or noncommittal, they have at the very least contributed to a misapprehension, but that is not the end of the analysis.  They might still overcome a fraudulent inducement claim or defense if they could fairly claim to be unaware of the other party's misapprehension. Here, undisputed facts foreclose that escape.

Great-West's supporting memorandum explains in detail at pages 26-32 how Orchin failed to satisfy the burden of fixing the misapprehension he created and indisputably knew about. His knowledge of the misapprehension shifted the burden to him to fix it, and when he first heard that Great-West employee Jan Guthrie understood Dr. Gadaire to be alive he remained silent. When he heard it again from Nancy Fix, he again remained silent.  The importance of whether Dr. Gadaire was alive or not was not lost upon Orchin, as he conceded in his deposition.

The Opposition fails to acknowledge that when someone outwardly demonstrates they are interpreting what they were told in a certain way, and that way is inaccurate, the duty on the party providing the information to correct the other's misapprehension immediately arises. The party who provided what they now know to be mistakenly interpreted information cannot remain silent.  Orchin did, and his inexcusable silence supplies the intent/scienter component of fraudulent inducement. The transcript of the calls, Exhibit 7 to Great-West's motion, establishes Orchin's fraudulent inducement.

Great-West showed at pages 30-31 of its supporting memorandum that mere denials of fraudulent intent do not foreclose summary judgment, but parties accused of fraud often deny intent.  Orchin has not directly done so, but arguments of counsel at page 8 of the Opposition surmise thoughts he might have had when he made his "I don't want [him or them] to know" comment.  Discussing who "them" might have referred to if the

comment is interpreted in Orchin's favor, the Opposition states that "Orchin could reasonably have been thinking of either the late Dr. Gadaire or Mrs. Gadaire…"  Given that Orchin was seeking to restore insurance <u>after</u> he knew Dr. Gadaire was dead and incapable of learning about it, he could only have been "thinking of" Dr. Gadaire if he agrees he used the word "him."  If so, he went beyond creating a misapprehension.

Summary judgment for Great-West on the fraud prong of Great-West's argument is proper if reached by the Court.

### IV.  The Third Claims Fail As A Matter Of Law

Great-West showed at pages 17-19 of its supporting memorandum why the third claims for relief fail as a matter of law.  These claims were allegedly grounded in "duty to cooperate" language in the certificate that Orchin and Gadaire claimed created a "reciprocal duty" on Great-West to provide premium notices to Dr. Gadaire after the assignment of the certificate.  Great-West challenged the claims on grounds that: 1) the certificate language did not impose on Great-West the "duty" claimed; 2) the claims are speculative; 3) they contradict other allegations Gadaire pleaded in her AC; 4) there are no facts showing that Great-West's "cooperation" in terms of sending premium notices to Dr. Gadaire was ever requested; and 5) failing to raise this supposed "contractual breach" with Great-West despite years of a consistent course of dealing waived this and the fifth claim for relief as further discussed at pages 22-23 of the supporting memorandum.

The Opposition devotes one paragraph to this claim at page 9.  The heading insists that the claim is not "ripe" for summary judgment, which presumably means Orchin and Gadaire believe summary judgment is inappropriate, since justiciability is not an issue.  The Opposition then changes this claim, specifically pleaded as arising from "duty to

cooperate" language, into a "breach of the implied covenant of good faith and fair dealing" claim premised on <u>California</u> law.  The Opposition states that the District of Columbia "has not addressed the issue of good faith and fair dealing in the contest of an insurance policy," and tries to change this to a claim about alleged defective notice to both "plaintiffs" rather than to Dr. Gadaire, the insured, as pleaded in ¶¶ 71 and 55 of Orchin's and Gadaire's ACs, respectively, and in the captions for these claims.

Great-West did not move for summary judgment regarding a claim that was not pleaded, and should not be required to address a new claim the Opposition concedes is not recognized by District of Columbia law which the Opposition elsewhere insists applies.  As discussed above, Orchin and Gadaire cannot avoid summary judgment by changing their claim, changing the law relied upon, and renouncing facts they pleaded. *See, e.g., Barrie*, 741 F.Supp.2d 250, 263-64 (D.D.C. 2010).  Avoiding the claim's defects also concedes Great-West's arguments.  *See, e.g., Sloan,* 689 F.Supp.2d 94, 121-22 (D.D.C. 2010) (collecting cases).  The third claims are legally and factually insupportable, the Opposition's "change the claim/ignore the motion" tactics are frivolous, and summary judgment should be entered for Great-West on these claims.

## V.  The Fourth Claims For Relief Fails As A Matter Of Law

The Opposition argues at pages 10-11 that the claim based on District of Columbia municipal regulations is valid. Great-West showed at pages 16-17 of its supporting memorandum why this claim, the fourth pleaded in the ACs, has no merit even if District law applied. Since Illinois law governs, the Court may decide not to reach the merits.

It is noteworthy that the Opposition has not put forth any argument to try to "save" the first claim for relief, also premised on District law and addressed on the merits at

page 16 of Great-West's supporting memorandum.   That claim should be deemed concluded if it is reached.   *See, e.g., Sloan*, 689 F.Supp.2d 94, 121-22 (D.D.C. 2010).

The Opposition insists that the failure of Orchin and the Gadaire's to pay the semi-annual premium and the termination of insurance that automatically resulted from that failure was a "cancellation."   Life insurance is an asset, and insurers do not "cancel" insured's assets.   The certificate accordingly contained no cancellation language.   Great-West did not cancel the insurance, and if it had, it would not have offered Orchin the chance to cure his termination by sending the lapse/reinstatement notice which is Exhibit 6 to Great-West's motion. The fourth claim is precluded by Illinois law and invalid legally and factually on its merits if reached.

### VI.  The Claim To Attorney Fees Under Illinois Law Is Frivolous

In an argument at pages 11-12, the Opposition asserts, as the heading states, that "Plaintiffs are entitled to an award of attorney fees under Illinois law" (caps. removed). Despite this assertion, the first sentence of this section insists that "Great-West's reliance on Illinois case law is misplaced," which appears to continue the theme raised elsewhere in the Opposition, such as at page 4, where it asserts that "[t]here is no reasonable relationship between this litigation and THE State of Illinois" (caps. in original). Perhaps this argument is a "fallback" in the event Illinois law is applied. In any event, it ends with an assertion that "the question of attorney's fees must be preserved for trial," suggesting this confusing argument should at least serve as a reason to deny summary judgment.

Great-West pointed out at pages 15-16 of its supporting memorandum that the attorney's fees generically requested in Orchin's and Gadaire's respective ACs are of no consequence because their claims for relief are exclusively breach of contract claims and

they could recover fees under Illinois law only if they had pleaded and ultimately prevailed on a statutory penalty claim.  The Opposition argues at page 11 that the Illinois statute does not necessarily preempt an independent tort action involving insurer misconduct.  Without delving unnecessarily into Illinois law on that separate topic, Great-West agrees.[8]  However, neither AC has a tort claim, and a never-pleaded tort claim is not a basis for recovering attorney's fees available pursuant to the penalty statute.

The Opposition states at page 12 that "even if Illinois law applies, [the statute] does not bar recovery."  Obviously the source of the remedy does not "bar recovery." The Opposition's discussion thereafter is equally pointless, because the elements of and defenses to a statutory penalty claim are not at issue.  Pleading a penalty claim requires some specificity.  Conclusory allegations to "leverage" a claim are insufficient. *Scudella v. Illinois Farmers Ins. Exchange*, 174 Ill.App.3d 245, 252, 528 N.E.2d 218, 222 (1st Dist. 1988).  *See also American Alliance Ins. Co. v. 1212 Restaurant Group, L.L.C.*, 342 Ill.App.3d 500, 511, 794 N.E.2d 892, 901 (1st Dist. 2003) ("If the insured merely states that the insurer committed vexatious and unreasonable delay without some modicum of factual support, the insured will not have stated a cause of action under section 155."). No such claim was pleaded by either Orchin or Gadaire, adequately or inadequately, and they cannot use summary judgment briefing to inject a new claim. *See, e.g., Barrie*, 741 F.Supp.2d 250, 263-64 (D.D.C. 2010).  No viable claim for attorney's fees exists.

---

[8] Prior to *Cramer v. Ins. Exchange Agency*, 174 Ill.2d 513, 675 N.E.2d 897 (1996), a few Illinois courts had recognized insurance bad-faith tort claims in the first-party context where an insured or beneficiary seeks insurance benefits.  *Cramer* clarified that in such situations, a breach of contract and statutory penalty claim allow a claimant to be made whole.  *Cramer* also pointed out that in unusual circumstances where a breach of contract remedy is unavailable, an independent tort claim could be, and it mentioned a fraud claim against an insurer as an example, but an "insurance bad-faith" tort claim would not be available. "Independent tort" and attorney's fees available by statute are separate and distinct topics, and neither is at issue.

### VII.  The Fifth Claims For Relief Fail As A Matter Of Law

The Opposition claims at page 12 that when the trust document was supposedly sent to Great-West with the assignment document, this was an "offer to Great-West to continue the Policy subject to the condition that Great-West agree to the stipulations of the Insurance Trust Document."  It states that although Great-West denies the trust document created any duties on it, "its actions suggested otherwise," *id*. at 13, but is silent as to those "actions."  The Opposition does state that Great-West accepted premiums and cites Illinois law regarding parties modifying an agreement by actions.

While course of dealing can modify contractual obligations, the issue is mutual assent and whether the trust document is a binding contract entered into by Great-West, not whether an agreement was modified by conduct that never changed.[9]  It is only Great-West's acceptance of post-assignment premiums (and after the trust document was supposedly sent to it) that the Opposition contends "proves" Great-West accepted the terms of the trust document, which the Opposition states at page 13 modified the insurance contract.  The Opposition insists an entirely consistent course of dealing, Great-West accepting premiums, signaled Great-West's acceptance of the document's terms.

This entire argument that "submitting" a trust document modified the insurance contract is facetious.  The Opposition does not claim the trust document was designed for or bears a Great-West employee's signature.  The Opposition does not point to anything that accompanied it when it was supposedly submitted informing Great-West that duties were being assigned to it, that it was being presented with a "condition that [it] agree to

---

[9]  At page 13 the Opposition cites District and Illinois cases that address offers and acceptances and both reference meeting of the minds.  The Opposition's portrayal of the trust document as modifying the insurance contract skips over whether Great-West was a party to the document.

the stipulations" of the document as now claimed, nor does it point to anything informing Great-West that by accepting premiums, it was a "de facto" party to the trust document.[10]

Given that the assignment by its terms expressly assigned away <u>all incidents of ownership</u>, as the certificate allowed, Great-West obviously could not refuse to accept premiums from the assignee/new owner.  Why this expressly contemplated acceptance of premiums from a new owner proves Great-West accepted duties in a separate and distinct document it did not sign and which did not contemplate its execution is ignored by the Opposition.  Orchin and Gadaire have no evidence that Great-West was a party to or otherwise demonstrated its agreement to be bound by terms in the trust document. Moreover, the waiver discussed below renders a merits analysis of the topic academic.

At page 14 the Opposition argues that the "Plaintiffs" did not waive their right to receive notices.[11] Although the Opposition repeats this with references to both "notices" and "premium notices," those statements are not supported by analysis. Nor does the Opposition argue that waiver doctrine is inapplicable, other than to state it is a question of fact—which is wrong because, like any fact question, it can be decided as a matter of law

---

[10] Establishing mailing requires an evidentiary foundation.  Great-West provided a foundation with respect to the premium notice and the lapse/reinstatement notice at pages 35-37 of its supporting memorandum. The Orchin/Gadaire camp's "proof of mailing" evidence is the statement of Ms. Gadaire that "I submitted the designations to Great-West" and "[t]o the best of my knowledge and recollection, I enclosed a copy of the Trust Agreement with my submission." Great-West's Exh. 2 at GRTWST 196, ¶ 6.  This statement, which curiously qualifies the trust document component of the "submission" with a "to the best of my knowledge and belief" comment, does not explain how the "submission" was made and claimed no adherence to any customary/reliable office procedures or anything of the like. Although Great-West has addressed the argument that the trust document was "submitted" to point out the legal defects in the argument and to qualifiedly "accept" the submission assertion to remove any perception of a fact dispute, Orchin and Gadaire have failed to support their position with proof of mailing (or other mode of delivery) evidence and thus their entire argument fails for lack of evidence.

[11] It was never pleaded that Plaintiff Gadaire was entitled to receive notice.  The theory referenced in the ACs was that Dr. Gadaire was entitled to receive notice.

if reasonable minds could not differ. *See* Great-West's supporting memorandum at 22. Mere denials of waiver, without analysis, are tantamount to failing to address/conceding an issue in briefing. *See, e.g., Sloan*, 689 F.Supp.2d 94, 121-22 (D.D.C. 2010).

The repeated denials are apparently just a distraction anyway, because at page 15 the Opposition concedes that "[b]ecause the intent to relinquish this right to receive a notice of cancellation cannot reasonably be inferred from the lack of enforcing the right to receive premium notices, intent to waive the right cannot be shown here." Orchin and Gadaire thus <u>admit</u> that any right of anyone to receive premium notices was indeed waived by "lack of enforcing the right," but they argue that the lapse/termination notice was "more important" than the ongoing semi-annual premium notices and they suggest that when termination came about, a new right to receive notices arose.[12]

The Opposition's strategy of admitting the waiver as to premium notices but characterizing the lapse/termination notice as something different does not help Orchin and Gadaire.  Since the language they point to in the trust document applied only to "premium notices," *see* Great-West's Exhibit 12 at 2, they have nothing to point to as the source of a duty to provide a different type of notice to anyone.  If the lapse/termination notice is a form of a premium notice, they admit the provision was waived.  If the notice is something else, the trust document created no rights regarding it in the first place.[13]

---

[12] At the top of page 15 the Opposition states that "[t]he lapse notice informed Orchin that coverage was about to be terminated." This appears to be an admission that Orchin received the lapse/termination notice. Since Great-West has established it was sent, an admission is unnecessary, but it would certainly impact the credibility of all of the "defective termination" arguments Orchin and Gadaire have raised.  It is also odd that the Opposition calls this notice of an *impending* termination, since it clearly stated that "[y]our insurance terminated on August 01, 2009 for nonpayment of the premium…"  *See* Great-West's supporting memorandum at 4.

[13] Should Orchin and Gadaire come forward and insist that they did not "really" mean to admit that the trust document's "duplicate premium notices" provision was waived by "lack of

## VIII.  Additional Arguments Raised In The Opposition

At page 15 the Opposition switches gears, asserts that "Great-West did not fulfill its statutory duty to provide notice," and, again straying from District of Columbia law, quotes an Illinois statute.  The Opposition does not explain how the statute fits into the analysis of this case, which involves two <u>now conceded</u> notices sent by Great-West, but the Opposition neglected the second paragraph of the statute, which states:

> This section shall not apply to cancellable accident and health policies which are renewable at the option of the company *nor shall it apply to group policies*…"

215 ILCS § 5/234 (2) (emphasis added).   No claims in the ACs invoked this statute as a basis for any claim pleaded, and it has no application to this case.[14]

At page 16 the Opposition asserts in a heading that "Dr. Gadaire did not assign his right to receive notice" and argues that the language of the assignment retained his right to receive "notices."   It is plainly clear that Dr. Gadaire assigned "all incidents of ownership," *see* Great-West's supporting memorandum at 2, and nothing in the assignment retained a right to "notices."   This assertion by Orchin and Gadaire has no substance and they argued that the trust document creates this supposed right specifically <u>because</u> it is not mentioned elsewhere.  Moreover, even if there was assignment language supportive of their position, the waiver from years of inaction still defeats their argument.

---

enforcing the right," then it should be deemed waived by their failure to offer any evidence to refute the lack of enforcement and their failure to challenge the correctness and applicability of the doctrine of waiver itself. *See, e.g., Sloan*, 689 F.Supp.2d 94, 121-22 (D.D.C. 2010).

[14] The statute states that if more than six months elapses after termination of insurance, the insurer can insist on termination even if it failed to comply with the statute's notice requirements. It is undisputed that the premium due on July 1, 2009 was not paid and there was no attempt to cure that failure within six months, so the statutory period expired and the statute would provide no remedy to Orchin and Gadaire even if it did apply and Great-West's notices were somehow insufficient. *See Nieder v. Jackson Nat'l. Life Ins. Co*., 2011 WL 3798224 *2-4 (N.D. Ill. 2011).

At pages 17-18 the Opposition states in a heading that "[a]n insured cannot waive notice under D.C law," followed by the observation that Great-West drafted the "policy," [actually certificate], and that nothing in the contract "absolves Great-West of the duty to send notices to Dr. Gadaire."   This is followed by the assertion that the "nature of the Policy" required Great-West to send notice to Dr. Gadaire.

Despite these and similarly broad statements at this point in the Opposition, it is long on conclusory assertions but short on analysis.  It identifies nothing in the certificate, the assignment document or any other evidence connected to these arguments that establishes Great-West had a duty to send post-assignment notices to Dr. Gadaire. Indeed, Gadaire pleaded in ¶76 of her AC that sending premium notices was not a contractually required duty of Great-West at all, to anyone, and that it was Orchin's duty to pay premiums anyway.  This underscores the Opposition's many contradictions.

"All incidents of ownership" means the new owner, Orchin, obtained all rights in the insurance certificate absent any carve-out. That included the right to any notices, required or not.  The Opposition has identified no carve-out.  Nobody was surprised or disappointed by how things operated for many years, and as Orchin testified in his deposition, everything worked to his satisfaction up to the point when he did not pay the premium due on July 1, 2009.  *See* Great-West's Exh. 1 at p. 18, line 1--p. 19, line 14.

Tellingly, the Opposition fails to address the undisputed fact that nobody has come forth with any evidence even suggesting that Dr. Gadaire, Ms. Gadaire or Orchin ever took the simplest step of just asking Great-West to send duplicate notices to Dr. Gadaire. *See* Great-West's unopposed statement of material facts, nos. 7-10.  They were obviously satisfied with Orchin managing all incidents of ownership as the assignment expressly

contemplated.  However, if they had simply made a request, Great-West would have sent courtesy notices to Dr. Gadaire.  Great-West's Exh. 4, Goodreau Decl., ¶17.  All the supposed anguish over duplicate notices is purely speculative and entirely inconsistent with how all parties operated, contently, for years.

## IX.  Conclusion

Great-West indisputably had no knowledge of Dr. Gadaire's death when it agreed to waive termination and reinstate the insurance, thus its waiver was ineffective and it properly revoked reinstatement upon learning the truth.  If the Court believes further analysis of the reinstatement is necessary, undisputed facts readily establish that Orchin defrauded Great-West's employees and thus the reinstatement is voidable by Great-West for this reason too.  Summary judgment on the second claims for relief should be entered.

If the termination of insurance effective July 1, 2009 was planned, this lawsuit is reprehensible.  If it was unplanned, Orchin and Gadaire cannot erase the reinstatement facts with revisionist history issues going back to when the insurance terminated and long before.  These include inapplicable notice requirements from District of Columbia law, an unavailable/never pleaded "bad faith" claim, and belatedly assigning Great-West a "duty" from a trust document it was not a party to, and a "duty" that the parties to the agreement waived and abandoned as to themselves and as to Great-West.

All of the revisionist history claims that seek to sidestep the reinstatement that is not binding on Great-West are legally and factually defective. Those claims expanded the ground that had to be covered, which may have been much of their purpose all along, but summary judgment on claims, one, three, four and five should be entered.

Respectfully submitted,


    / s / Matthew J. Youssef
Craig D. Roswell, Esquire #433406
Matthew J. Youssef, Esquire #MD17910
NILES, BARTON & WILMER, LLP
111 South Calvert Street, Suite 1400
Baltimore, Maryland 21202
(410) 783-6300 *telephone*
(410) 783-6363 *facsimile*
cdroswell@nilesbarton.com
mjyoussef@nilesbarton.com
***Counsel for Defendant, Great-West Life &
Annuity Insurance Co.***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of August, a copy of the Defendant Great-West's Reply to Plaintiffs' Joint Opposition to Its Motion for Summary Judgmentwas served by the electronic filing of this pleading to all counsel entered in this matter pursuant to LCvR 5.4(d).

    / s / Matthew J. Youssef
Matthew J. Youssef

4828-4593-9741, v. 1