**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JEREMY D. ORCHIN, Trustee of the Eugene C. Gadaire Insurance Trust,**  )<br><br>**Plaintiff,**  )<br><br>v.  )<br><br>**GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY,**  )<br><br>**Defendant,**  )<br><br>**ELIZABETH GADAIRE,**  )<br><br>**Plaintiff,**  )<br><br>v.  )<br><br>**JEREMY D. ORCHIN,** *et al.*,  )<br><br>**Defendants.**  ) | **Civil Action No. 12-1743 (RDM)**<br>**(consolidated with No. 13-0055)**<br><br><br><br><br><br><br><br>**Civil Action No. 13-00055 (RDM)**<br>**(consolidated with No. 12-1743)** |

**MEMORANDUM OPINION**

These consolidated cases arise out of a dispute over the life insurance coverage of Dr. Eugene C. Gadaire, which was assigned to a trust maintained for the benefit of Dr. Gadaire's spouse, Elizabeth Gadaire. The trustee—Jeremy D. Orchin—missed two semi-annual payments beginning in July 2009, leading to the termination of Dr. Gadaire's coverage. After the insurance lapsed, Dr. Gadaire died. Upon learning of Dr. Gadaire's death and realizing that he had failed to make the required payments, Orchin contacted the insurance company, Great-West Life & Annuity Insurance Co. ("Great-West"), and successfully convinced them to reinstate the

insurance—without mentioning that Dr. Gadaire was already deceased.  After learning that Dr. Gadaire had died before the insurance was reinstated, Great-West asserted that the reinstatement was invalid and refused to pay the $750,000 value of the insurance benefits to the trust.

Orchin brought suit against Great-West on behalf of the trust, alleging that Great-West breached contractual obligations and failed to comply with relevant laws in terminating the insurance and that it should have honored the reinstatement.  *Orchin v. Great-West Life & Annuity Insurance Co.*, No. 12-cv-01743 (D.D.C. Oct. 26, 2012).  In a separate action, Mrs. Gadaire brought similar claims against Great-West and additionally sued Orchin for missing the payments and causing the insurance to lapse.  *Gadaire v. Orchin*, No. 13-cv-00055 (D.D.C. Jan. 14, 2013).  The two cases were subsequently consolidated.[1]  *See* Minute Order, Feb. 1, 2013.

Three motions for summary judgment are now before the Court.  In the first, Orchin seeks summary judgment against Great-West.  Dkt. 29.  In the second, Mrs. Gadaire seeks summary judgment on two of her three claims against Orchin.  Dkt. 30.  And in the third, Great-West seeks summary judgment against both Orchin and Mrs. Gadaire.  Dkt. 31.  For the reasons set forth below, the Court **GRANTS** Great-West's motion for summary judgment, Dkt. 31, and **DENIES** the motions for summary judgment filed by Orchin and Mrs. Gadaire, Dkts. 29 and 30.

## I.  BACKGROUND

Except as noted, the following facts are undisputed.  In April 1975, Dr. Gadaire, a recent graduate of dental school, obtained insurance through an American Dental Association ("ADA") group term life insurance policy administered by Great-West.  *See* Dkt. 29-1 (application for insurance), Dkt. 31-6 (certificate of insurance).  His spouse, Elizabeth Gadaire, was designated

---

[1]  The order consolidating the cases provided that all filings be entered only in the lead case, *Orchin v. Great-West Life & Annuity Insurance Co.*, No. 12-cv-01743 (D.D.C. Oct. 26, 2012). *See* Minute Order, Feb. 1, 2013.  Accordingly, all citations to the record refer only to that case.

as one of the insurance's beneficiaries.  Dkt. 31-6 at 35.  Payments were due twice a year, on

July 1 and January 1.  *Id.* at 11; Dkt. 31-7 ¶ 4.  The certificate of insurance provided that "31

days are allowed to pay a premium in default. . . .  If the premium is not paid by the end of the

days of grace, the insured Member's insurance will terminate," Dkt. 31-6 at 11, and, in another

provision, explained that "[t]he insurance of an insured Member will end on the earliest of the

following: . . .  the 32nd day after the due date of any unpaid premium."  *Id.* at 18.

      In 1993, Dr. Gadaire transferred ownership of his life insurance to a trust he created, the

Eugene C. Gadaire Insurance Trust ("Trust").  *See* Dkt. 29-4 at 7-17 (Trust Agreement).  The

Trust's sole beneficiary is Mrs. Gadaire.  Dkt. 21 ¶ 15; *see also* Dkt. 29-4 at 9.  Orchin—who is

also a dentist and was Dr. Gadaire's close friend, Dkt. 31-4 at 3, 10-11—was named as the

trustee.  Dkt. 29-4 at 7.  To transfer the life insurance to the Trust, Dr. Gadaire submitted to

Great-West an assignment of ownership form, Dkt. 29-4 at 3, and an "Absolute Assignment of

All Incidents of Ownership" form, Dkt. 29-4 at 5.  Plaintiffs claim that they also submitted a

copy of the Trust Agreement between Orchin and Dr. Gadaire, Dkt. 29-4 at 7-17; Dkt. 29-20

(declaration from Mrs. Gadaire asserting that "[t]o the best of [her] knowledge and recollection,

[she] enclosed a copy of the Trust Agreement" along with her Designation of Beneficiary and

Designation of Ownership forms to Great-West); but Great-West disputes this, *see* Dkt. 31-7 ¶

16 (noting that there is no evidence that the Trust Agreement was sent to Great-West at this

time).  The "Absolute Assignment of All Incidents of Ownership" form provided, in relevant

part, that Dr. Gadaire was assigning

> the insurance on [his] life . . . together with all incidents of ownership therein and
> all [his] right, title, claim, interest, and benefit in and to all moneys which are or
> may at any time become payable thereunder or in connection therewith, with full
> power to the assignee to receive same and grant receipts therefor . . . , and with
> full power of the assignee at any time to exercise all rights, options and privileges

given to or at any time exercisable by the insured under the said policy in respect
to the insured's interest under the above certificate.

Dkt. 29-4 at 5. Under the new arrangement, Dr. Gadaire remained the insured, but ownership of
the insurance was transferred to the Trust.

The Trust Agreement provided that Orchin, as trustee, would make payments on the
insurance. Dkt. 29-4 at 7. To fulfill that responsibility, whenever Orchin received a statement,
he would call Mrs. Gadaire and tell her that a payment was due. Mrs. Gadaire would then
deposit money in the Trust's checking account, and Orchin would write a check to Great-West.
Dkt. 29-5 at 8.

From 1993 through the payment due January 1, 2009, Orchin made every semi-annual
payment as required on behalf of the Trust. Dkt. 31-7 ¶ 4. Before payments were due, Great-
West would mail a notice of payment due to Orchin's address of record, which was his home on
44th Street, NW, Washington, D.C. *Id.*; Dkt. 31-10 at 3. In April 2009, Orchin moved to a new
home on Westover Place, NW, Washington, D.C. *See* Dkt. 26 ¶ 26; Dkt. 31-4 at 6. Before that,
as a "temporary measure," he moved into an apartment in Bethesda, Maryland, while renovating
the new home.[2] Dkt. 31-4 at 6. He allegedly submitted change of address forms to the U.S.
Postal Service after each move, but he did not notify Great-West of his moves. *Id.* In June 2009,

---

[2] In one deposition, Orchin stated that he moved to his new Westover Place home in 2008 and
that he moved to the temporary Bethesda home in 2007. Dkt. 31-4 at 6, 11. In another
deposition, he stated that he submitted his change of address form for the move from Bethesda to
Washington, D.C. to the U.S. Postal Service in April 2009. Dkt. 37-5 at 8. His amended
complaint states that he moved in April 2009, but it does not specify when he moved to the
Bethesda home. Dkt. 26 ¶ 26. Because it appears that Orchin was mistaken about the timing of
the move back to D.C., it is not entirely clear from the record when, exactly, Orchin moved to
Bethesda. In any event, although Orchin testified that he did not specifically recall receiving
premium notices from Great-West during 2007 and 2008, he paid the premiums due during that
period. Dkt. 31-4 at 8; *see also* Dkt. 31-7 ¶ 4.

Great-West mailed a notice for the premium due on July 1, 2009, to Orchin's address of record, which was still the 44th Street address.  Dkt. 31-7 ¶¶ 4-6.[3]  When Orchin did not pay the premium within the 31-day grace period that expired on July 31, Great-West mailed a notice of termination, which offered an additional 31-day period during which insurance could have been reinstated without re-application or re-qualification.  *Id.* ¶ 25.  Dr. Orchin testified that he never received a premium notice in July 2009 and also asserts that he did not receive a lapse notice in August 2009.  Dkt. 31-4 at 6; Dkt. 29-10 at 3; *see also* Dkt. 31-7  ¶ 22.

It is undisputed that no payment was made for the premium due on July 1, 2009.  The coverage accordingly terminated on August 1, 2009.  *See* Dkt. 31-10 at 3-5.  The deadline for the next payment that would have been due—January 1, 2010—also passed without Orchin or the Gadaires making a payment or contacting Great-West.  *See* Dkt. 30-10 at 2-5; Dkt. 26 ¶ 33; Dkt. 31-7 ¶ 18.

Dr. Gadaire died suddenly on January 15, 2010.  Dkt. 21 ¶ 25, Dkt. 26 ¶ 36; Dkt. 29-16; Dkt. 29-10 at 13.  Three days later, Orchin—who was aware of Dr. Gadaire's death and realized

---

[3]  Although they do not directly argue the point, Plaintiffs suggest that whether Great-West ever mailed the June 2009 notice of premium due and the August 2009 termination notice is disputed. Dkt. 39-2 at 3.  The only evidence Plaintiffs adduce to dispute Great-West's evidence that the notices were mailed, however, is Orchin's assertion that he never received the notice.  Great-West submitted a declaration describing in detail its largely-automated system for ensuring that notices are properly mailed.  Dkt. 31-7 ¶¶ 22-26, and produced a copy of both of those notices. Dkt. 31-8, Dkt. 31-9.  Given this evidence and the undisputed evidence that Orchin did not change the address on record with Great-West before he moved, the fact that he did not *receive* these notices does not create a dispute of material fact as to whether they were ever *mailed* to his address of record.  *See Spinelli v. Monumental Life Ins. Co*., 476 F. Supp. 2d 898, 909 (N.D. Ill. 2007) (quotation marks omitted) (Under Illinois law, "[w]hile an insurer is required to provide notice to a policy holder that a premium is overdue before rescinding that policy, it is only required to prove that a legally sufficient notice was addressed and mailed, not that it was received by the policy holder.") (quotation marks omitted).

that he had not made the most recent payment on the insurance—called Great-West.  Dkt. 31-4 at

9-11.  In that phone call, which was recorded,[4] Orchin stated:

> I'm the trustee of a life insurance trust for a friend of mine and I think I need to
> clear up a discrepancy in billing.  I haven't gotten a statement for the balance that
> was due in December.  I think I've moved several times and I've put in a change
> of address but I'm not sure it's gotten through so I need some help to clarify this.

Dkt. 31-4 at 2.  Great-West representative Jan Guthrie explained that the insurance had been

terminated, and she noted that the address in the system was 2831 44th Street, NW—Orchin's old

address.  *Id.* at 3.  Orchin repeated that he was the trustee and stated that he needed "to reinstate

the policy because there was a miscommunication on addresses," and he asked whether any

notices "would have been sent out . . . [b]ecause [he] didn't get anything."  *Id.*  Guthrie explained

that "a bill would have been sent out in June for the July 1 renewal, and then since [Great-West]

did not receive payment within that 31 day grace period, by the end of July, a lapse notice would

have been sent out."  *Id.*  She asked whether Orchin had put in a change of address form, and he

explained that he "neglected to do that because of . . . two moves in six months."  *Id.*  Orchin

further explained that it was "his fault" and that he was under "a lot of pressure because [he was]

the trustee."  *Id.*

Guthrie explained that Dr. Gadaire's insurance could not be reinstated and that Dr.

Gadaire would have to re-apply for life insurance.  *Id.*  In response, Orchin asked if he could talk

to someone higher up and explained the situation.  The parties debate what exactly Orchin said,

as follows:

> Is there someone else I can talk to that might have more influence because I'm
> feeling so guilty,  I've been a trustee for 15 years and I've never let it slip and I

---

[4]  With one small exception, the parties do not dispute the contents of the telephone
communications and have submitted a stipulated transcript of those calls.  Dkt. 31-10; *see id.* at 3
(parties disagree whether Orchin stated "I don't want *him* to know that I did this" or "I don't
want *them* to know that I did this.").

don't want [him *or* them—*parties disagree*] to know that I did this.  There must
be a way that I can pay the past monies or something.

Dkt. 31-10 at 4.  Guthrie agreed to ask a supervisor, Nancy Fix, to speak to Orchin.  *Id.* at 5; *see*

Dkt. 29-11 at 10.

Orchin then explained his dilemma to Fix, noting that in the last year he had "moved

twice" and that he had not received a notice for the premium.  Dkt. 31-10 at 5.  He asked if there

was any way that he could pay the back premiums and further stated that "I don't want them to

know . . . ."  *Id.*  Fix told Orchin that she would need to speak to a "higher manager."  *Id.*  She

subsequently contacted manager Rochelle DeMills.  Dkt. 29-11 at 11-12.  DeMills testified at her

deposition that she looked at Dr. Gadaire's "coverage history," reviewed his file "in full," and

saw that he was a "long-standing participant" with a good payment history.  Dkt 29-13 at 7.  She

then noticed that Dr. Gadaire had previously applied for further insurance and had been declined

for health reasons and thus concluded that Dr. Gadaire would probably not be able to

successfully re-apply for life insurance.  *Id.* at 8.  In light of Dr. Gadaire's status as a long-time

customer, the fact that he would not be able to re-apply for insurance, and the fact that the trustee

had made this mistake, DeMills decided to exercise her authority to reinstate the coverage.  *Id.* at

8-9.

Fix called Orchin back and left a voicemail informing him that Great-West would "make

a one-time exception just because this isn't, you know, [Dr. Gadaire's] doing" and explained that

she would send a bill that afternoon.  Dkt. 31-10 at 6.  Great-West followed up with a written

letter establishing that Great-West would make a "one time exception and reinstate Dr. Gadaire's

Term Life coverage."  Dkt. 29-17 at 2.  The letter noted that the exception was "not to set

precedence" and that Great-West would "require evidence of insurability with full medical

underwriting if the policy lapses for non payment of future premiums."  *Id.*  Orchin paid the back

premiums, and the insurance was reinstated.  *See* Dkt. 29-18; Dkt. 29-21.  During this course of

these communications, Orchin never disclosed that Dr. Gadaire was deceased.

 Great-West did not learn that Dr. Gadaire had died until Dr. Gadaire's former business

partner, Dr. Tromblay, called several weeks later to report the death.  *See* Dkt. 29-10 at 11-12.

Dr. Tromblay incorrectly believed that he and Dr. Gadaire had obtained "buy/sell insurance"—

that is, life insurance intended to provide surviving business partners with the funds needed to

buy out a partner's share of the business upon death.  *Id.*; *see also* Dkt. 31-7 ¶ 9.  In fact,

although Drs. Tromblay and Gadaire had applied for buy/sell insurance in 2007, the request was

denied because Great-West concluded that Dr. Gadaire was uninsurable due to a heart condition.

*See* Dkt. 29-14; Dkt. 29-15.  This denial was the basis for DeMills' conclusion that Dr. Gadaire

would not have been able to re-apply for insurance.  Dkt. 31-11  ¶ 5.  Upon being informed of

Dr. Gadaire's death, Great-West's personnel "followed normal procedures" by sending a claim

form to Orchin, as trustee for the beneficiary of record, Dkt. 31-7 ¶ 13.  Orchin signed and

returned the claim form on February 10, 2015.  *Id.*

  Upon investigating Dr. Gadaire's death, Great-West quickly became aware that he had

died three days before the insurance was reinstated, *id.*, and it denied Orchin's claim both on that

basis and because Great-West employees concluded that Orchin had misled them.  *Id.* ¶ 15.

Great-West also sent a refund of the back-premiums that Orchin had paid in order to reinstate the

insurance.  *Id.*

 In October 2012, Orchin brought suit against Great-West.  Dkt. 1.  Mrs. Gadaire brought

suit against both Orchin and Great-West in January 2013, *see Gadaire v. Orchin*, No. 13-cv-0055

(Jan. 14, 2013), and the cases were consolidated shortly thereafter.  The consolidated cases

include two operative complaints.  In Mrs. Gadaire's amended complaint, Dkt. 21, she asserts

five counts against Great-West and three "alternative" counts against Orchin.  The five counts

against Great-West are each styled as breach of contract claims.  Count I alleges that Great-West

violated D.C. Code Section 31-4201, which sets forth notice requirement for "cancellation" of

insurance policies, ¶¶ 36-47; Count II alleges that the insurance was in effect when Orchin filed a

claim on behalf of the trust and that Great-West breached its contract by failing to tender

proceeds, ¶¶ 48-52; Count III alleges that Great-West breached its "duty to maintain contact with

its insured," ¶¶ 53-56; Count IV alleges that Great-West violated District of Columbia

regulations requiring notice for cancellation of an insurance policy, ¶¶ 57-63; and Count V

alleges that Great-West breached its contract by failing to provide notices to Dr. Gadaire (in

addition to the notices sent to Orchin), ¶¶ 64-68.  Mrs. Gadaire's "alternative" claims against

Orchin include claims for negligence, ¶¶ 69-83; breach of contract, ¶¶ 83-90; and breach of

fiduciary duty, ¶¶ 91-99.  Orchin's amended complaint, Dkt. 26, asserts five counts against

Great-West, which, as the parties agree, are materially the same as Mrs. Gadaire's claims against

Great-West.  *See* Dkt. 31-1 at 2 n.1.  All three parties have now moved for summary judgment.

### III.  DISCUSSION

Because Mrs. Gadaire's claims against Orchin only arise if Great-West properly declined

to pay the Trust the proceeds from the insurance, the Court will address Plaintiffs' claims against

Great-West before turning to Mrs. Gadaire's separate claims against Orchin.[5]  Because this issue

arises on summary judgment, the Court must consider whether any genuine issue of material fact

is in dispute, and, if not, which, if any, of the cross-moving parties is entitled to judgment as a

---

[5]  In their briefs, Mrs. Gadaire refers to Orchin as "Defendant," Great-West refers to Orchin as
"Plaintiff," and Orchin refers to himself as "Counter-Claimant."  To avoid confusion, the Court
refers to each party by name rather than by their status in this litigation, except that the Court
refers to Orchin and Mrs. Gadaire, collectively, as "Plaintiffs" in the context of discussing the
claims brought by both of them against Great-West.

matter of law.  Fed. R. Civ. P. 56; *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986).

Under Rule 56, the moving party bears the initial burden to identify the portions of the record

that, in its view, "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323 (1986).  If the moving party carries that burden, the opposing party

must then "designate specific facts showing there is a genuine issue for trial."  *Id.* at 324

(quotation marks omitted).  As explained below, the Court concludes that the undisputed facts

support judgment for Great-West, but that summary judgment is not warranted at this point on

the claims between Orchin and Mrs. Gadaire.

## A.  Plaintiffs' Claims Against Great-West

Plaintiffs claim that Great-West breached its contractual obligations and contravened

District of Columbia law by failing to pay the $750,000 value of Dr. Gadaire's insurance to the

Trust.  Their allegations focus on two questions:  (1) whether Great-West provided adequate

notice before terminating Dr. Gadaire's insurance, and (2) assuming the insurance was properly

terminated, whether Great-West's decision to reinstate the insurance bars Great-West from

refusing the pay the insurance proceeds, even though Dr. Gadaire was already deceased when

Great-West reinstated the insurance.

### 1.  *The August 2009 Termination Of Coverage*

The first issue is whether the August 2009 termination of Dr. Gadaire's insurance

coverage was effective.  Plaintiffs contend that it was not because, in their view, Great-West

failed to comply with specific notice requirements imposed by the District of Columbia Life

Insurance Act, D.C. Code §§ 31-4201 *et seq.*, and D.C. municipal regulations promulgated

pursuant to that Act.  *See* Dkt. 29-1 at 8-15.  They contend that because Dr. Gadaire was a D.C.

resident, the insurance certificate should be construed to incorporate the minimum requirements

of D.C. law.  *Id.*; *see* Dkt. 26 ¶¶ 60, 76; Dkt. 21 ¶¶ 44, 58.  Great-West responds that pursuant to

the express choice-of-law provision contained in the certificate of insurance, the law of Illinois

law—not D.C.—governs all disputes arising out of the insurance contract and that the Court

should, therefore, decline to construe the insurance to incorporate D.C. law.[6]  It is undisputed

that Illinois law contains no provisions equivalent to the D.C. rules upon which Plaintiffs'

premise their claims.  *See* Dkt. 29-1 at 11.

In diversity cases like this one, "the law of the forum state supplies the applicable choice-

of-law standard."  *Williams v. First Gov't Mortg. & Inv'rs Corp.*, 176 F.3d 497, 499 (D.C. Cir.

1999).  The Court thus applies D.C. choice of law rules.  Under those rules, courts enforce

express contractual choice of law provisions "'as long as there is some reasonable relationship

with the state specified.'"  *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995)

(quoting *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980)); *see also*, *e.g.*, *Aneke v. Am. Exp.*

*Travel Related Servs., Inc.*, 841 F. Supp. 2d 368 (D.D.C. 2012) (quoting this rule and applying

Utah law where the defendant was based in Utah).

The D.C. Circuit has applied this choice of law rule in a case similar to this one.  In

*Whiting v. AARP*, a resident of Arizona was insured under a group life insurance plan, and the

certificate of insurance specified that disputes arising out of the insurance agreement would be

governed by D.C. law.  637 F.3d 355, 361 (D.C. Cir. 2011).  Applying D.C. choice of law rules,

the Court of Appeals concluded that a "reasonable relationship" with D.C. existed because the

group plan was sponsored by an entity that was based in D.C.  *Id*.  Accordingly, despite the fact

---

[6]  Great-West further argues that because Plaintiffs acknowledged in their amended complaints
that the choice of law provision applies, "albeit under the mistaken notion that it applies 'jointly'
with the District of Columbia," Plaintiffs are "precluded" from arguing that Illinois law does not
apply. Dkt. 41 at 5.  Because the Court concludes that Illinois law applies and the D.C.
provisions do not, the Court need not address this argument.

that the insured was a resident of Arizona, the Court concluded that the choice of law provision

in the agreement should be given effect and that the dispute should be resolved under D.C. law.

*Id.*

Here, Dr. Gadaire was insured under a certificate of insurance he purchased pursuant to a

group policy sponsored by the American Dental Association.  That certificate contains an

express choice-of-law provision, which reads as follows:

> At the request of the [ADA], which is headquartered in Chicago, Illinois, and with
> the agreement of [Great-West], the Policy and any dispute between an insured
> person or claimant and the Company arising in connection therewith are subject
> to, governed by, and shall be construed in accordance with the law of the State of
> Illinois . . .  The Policy is sitused in the State of Illinois, and is amended to
> comply at all times with the minimum requirements of the State of Illinois, which
> apply to Group Term Life Insurance.  The Policy and individual Certificates
> issued are deemed to be issued in the State of Illinois.

 Dkt. 31-6 at 25.  Because the ADA is headquartered in Illinois, the contractual choice of

law provision bears the same "reasonable relationship with the state specified" as the

choice of law provision at issue in *Whiting*.  637 F.3d at 631.  Thus, for the reasons given

in *Whiting*, the provision must be enforced.

This conclusion is consistent with the unique nature of group insurance policies.

As the Supreme Court has explained, parties to a group insurance plan intend that

"everywhere it shall have the same meaning and give the same protection, and that

inequalities and confusion liable to result from applications of diverse state laws shall be

avoided."  *Boseman v. Connecticut Gen. Life Ins. Co.*, 301 U.S. 196, 206 (1937)

(enforcing choice of law provision in group life insurance policy).  Choice of law

provisions in group insurance plans promote uniformity.  Moreover, because large

employers and associations like the ADA have significantly more negotiating power than

individuals, "[c]hoice-of-law provisions contained in group life insurance policies are . . .

less likely [than those in individual insurance policies] to have a 'take-it-or-leave-it'
character," and courts are accordingly especially likely to enforce choice of law
provisions in group plans.  *See* Restatement (Second) of Conflict of Laws § 192, cmt. h
(1971).

Plaintiffs attempt to avoid the plain language of the choice-of-law provision in several
ways.  First, they argue that the certificate of insurance "should be construed in accordance with
*both* the law of Illinois and the law of the District of Columbia, and when in conflict or [when]
Illinois law is silent on an issue, the law of the District of Columbia should prevail and govern."
Dkt. 29-1 at 11 (emphasis added).  Because Illinois has no laws that "directly address[ ] or
conflict[ ] with" the D.C. Code provisions that form the basis for Plaintiff's claims, they argue,
D.C. law controls.  *Id.*  In other words, Plaintiffs ask the Court to give effect to the choice of law
provision only to the extent that Illinois law neatly overlaps with the law of the state in which the
individuals insured under the group policy live.  That contention, however, simply rejects the
meaning of a choice of law provision.  If subject to the law of "both" jurisdictions, as Plaintiffs
suggest, group insurance policies would continue to lack uniform application, and, if anything,
uncertainty would increase.  Moreover, the fact that Illinois does not have any rule or statute that
conflicts on its face with the D.C. notice provisions does not mean that Illinois law, and those
who rely on it, are necessarily indifferent to the issue; the absence of a rule can be as much of a
policy choice as the adoption of one.

Plaintiffs also argue that there is no "reasonable relationship" between the case and the
state of Illinois.  *See* Dkt. 39-2.  But the question is not whether a particular case bears a
sufficient nexus to the choice of law forum; rather, it is whether a "reasonable relationship
exists" between the group policy and the choice of law forum.  "Unlike individual insurance

policies, rights against the insurer under a group policy are generally governed by the law of the state where the master policy was delivered." *Karpenski v. Am. Gen. Life Cos., LLC*, 999 F. Supp. 2d 1235, 1242 (W.D. Wash. 2014) (brackets and quotation marks omitted); *see also, e.g.*, *Boseman*, 301 U.S. at 206; *Whiting*, 637 F.3d at 361; *Miller v. Home Ins. Co.*, 605 S.W.2d 778, 780 (Mo. 1980) (en banc); Restatement (Second) of Conflict of Laws § 192, cmt. h (1971). Indeed, in light of the strong interest in uniformity, the Restatement rule is that even in the absence of a choice-of-law provision, the location of a group policyholder—not of the insured individual or the litigation—governs disputes between individuals and insurance companies. *See* Restatement (Second) of Conflict of Laws § 192 cmt. h (1971).

Plaintiffs next argue that the choice of law provision in the group policy "must be balanced with the interests of the District of Columbia in protecting its residents from wrongful or deceptive acts of insurance companies." Dkt. 29-1 at 8. The D.C. Circuit, however, at least implicitly rejected just that approach in *Whiting*. In the underlying district court decision in that case, the court balanced Arizona's interests against D.C.'s interests to determine which jurisdiction's consumer protection laws applied, and it considered the choice-of-law provision as one factor in that analysis. *Whiting v. AARP*, 701 F. Supp. 2d 21, 29 (D.D.C. 2010).[7] Reviewing that decision, the Court of Appeals did not engage in an interest-balancing approach, but, instead, concluded that the choice of law provision was dispositive based solely on that the fact that the group policyholder was located in D.C., thus establishing a "reasonable relationship" with the jurisdiction. *Compare Whiting*, 637 F.3d at 361, *with Whiting*, 701 F. Supp. 2d at 29.

---

[7] As to other issues, the district court concluded that no choice of law analysis was necessary because the laws did not conflict. 701 F. Supp. 29 at 26.

Courts do, of course, decline to enforce contractual choice of law provisions that contravene a "'fundamental policy'" of a state with "'a materially greater interest than the chosen state.'"  Restatement (Second) of Conflicts of Law § 187(2).  Maryland common law—to which "D.C. law 'commonly looks for guidance in the absence of its own precedents,'" *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1171 (D.C. Cir. 2003)—recognizes this exception.  *See, e.g.*, *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 249 (Md. Ct. App. 1994).  But the exception does not apply whenever there is a mere difference in law; indeed, such a rule would entirely defeat the utility of choice of law covenants.  Rather, for another state's "law to be unenforceable, there must be 'a strong public policy against its enforcement,'" *id.*, and Maryland "has not hesitated to apply out-of-state law, even where it would trump an act of the [legislature]."  *Henry v. Gateway, Inc.*, 979 A.2d 287, 298 (Md. Ct. Spec. App., 2009).  Maryland courts thus typically reserve application of the public policy exception to unusual circumstances, such as where a statute expressly states that its violation would be contrary to public policy, *see, e.g.*, *Nat'l Glass*, 650 A.2d at 250,  or where application of another state's law would violate policy expressed in Maryland's state constitution.  *Henry*, 979 A.2d at 9.

Although it is possible that D.C. courts might, in some circumstances, decline to enforce state laws that are less protective of individual life insurance for public policy reasons, Plaintiffs have failed to show that such a departure from the ordinary rule is warranted here.  First, given that the ADA, which negotiated the policy, is based in Illinois, and that Orchin is one of many insured individuals, it is not at all clear that the District of Columbia has a "materially greater interest" in this dispute than Illinois.  Moreover, although Plaintiffs' claims are predicated on statutory and regulatory provisions that govern life insurance "policies" issued or delivered in D.C., a separate provision of the D.C. Life Insurance Act specifically provides that "the standard

provisions required for individual life insurance policies shall not apply to group life insurance policies" that are delivered in the District.  D.C. Code § 31-4711.  In other words, it is not even clear that group insurance policies issued in D.C. would, in any event, be subject to the provisions upon which Plaintiffs rely.

Plaintiffs also mount several arguments against the termination of the insurance that are not exclusively predicated on D.C. law.  They allege that when Dr. Gadaire assigned his insurance to the Trust and, as required, filed related paperwork with Great-West, he also submitted a copy of the Trust Agreement.  *See* Dkt. 29-20.[8]  Plaintiffs characterize this submission as an "offer," and contend that by effectuating the assignment and accepting payments from Orchin (rather than from Dr. Gadaire), Great-West impliedly "accepted the benefits" of a "contractual Assignment Agreement between [Great-West], Dr. Gadaire, and the Trust" that bound Great-West to abide by terms of the Trust.  Plaintiffs attempt to cast Great-West as an active participant in this so-called "contractual Assignment Agreement between [Great-West], Dr. Gadaire, and the Trust" by suggesting that *Great-West*—rather than Dr. Gadaire—"assigned" the insurance to the Trust.  The Trust Agreement, in turn, provided that notice of premiums should be sent to *both* Orchin and Dr. Gadaire.  Dkt. 29-4 at 8. ("All premium notices shall be mailed to the Trustee . . . , with a copy to the Grantor").  Thus, the argument goes, Great-West breached its contract by failing to mail notices to Dr. Gadaire.

---

[8]  In support of their argument that they submitted the trust agreement to Great-West, Plaintiffs rely on the testimony of Mrs. Gadaire, who submitted an affidavit stating that "[a]s office manager, [she] submitted the [assignment forms] to Great-West for processing.  To the best of my knowledge and recollection, I enclosed a copy of the Trust Agreement with my submission." Dkt. 29-20 ¶ 6.

This argument merits little discussion.[9]  First, to the extent Plaintiffs seek summary judgment on this issue, Great-West has adduced evidence that they did not receive the Trust Agreement in 1993.  Dkt. 31-7 ¶ 16.  More to the point, even assuming that the Trust Agreement was sent to Great-West, Great-West was not a party to that agreement.   The Trust Agreement is, on its face, "between Eugene C. Gadaire . . . (hereinafter referred to as 'Grantor'), and Jeremy D. Orchin (hereinafter referred to as 'Trustee')."  Dkt. 1-2 at 2.  Great-West is not mentioned in the Trust Agreement, except in an attachment listing two insurance policies—and even that attachment describes the "insurance trust agreement . . . between Eugene C. Gadaire, Grantor, and Jeremy D. Orchin, Trustee."  *Id.* at 12.  The Court concludes as a matter of law that mailing this fully-executed agreement, along with a "change of ownership" form and a "change of beneficiary" form, did not make Great-West a party to the Trust Agreement, even though Great-West continued to accept payments for the insurance from the Trust.  Dkt. 1-3 and Dkt. 1-4.

Finally, Plaintiffs' third claim alleges that Great-West breached an implied "duty to maintain contact with the insured" by failing to send "correspondence, notices, or premium statements" to Dr. Gadaire.  Dkt. 26 at ¶¶ 68-72; Dkt. 21 ¶¶ 53-56.  Great-West argues that nothing in the insurance contract imposed such a condition and that there is no evidence that anyone ever requested that Great-West send notices to Dr. Gadaire.  Plaintiffs do not respond to this argument, but, instead, recharacterize the claim as one alleging that Great-West breached an implied duty of good faith and fair dealing by failing to notify Dr. Gadaire prior to cancelling the

---

[9]  Plaintiff submitted an expert report asserting that if the Trust was received prior to the lapse of the insurance, "any notice sent to the Trustee should have been provided to Dr. Gadaire."  Dkt. 29-22 at 3.  However, "[a]n expert witness may not deliver legal conclusions on domestic law, for legal principles are outside the witness' area of expertise under Federal Rule of Evidence 702."  *Weston v. Washington Metro. Area Transit Auth.*, 78 F.3d 682, 684 (D.C. Cir. 1996), *opinion amended on reh'g*, 86 F.3d 216 (D.C. Cir. 1996).

insurance, and they assert, without explanation, that the claim is not "ripe for summary judgment."  Dkt. 39-2 at 5 (discussing California law on implied duties).  Great-West argues that Plaintiffs are attempting, in effect, to amend their pleadings to state new claims.  But even construing Plaintiffs' pleadings as alleging claims for breach of the duty of good faith and fair dealing, Claim III cannot stand.  Plaintiffs' argument is not that Great-West acted in bad faith; rather, with no relevant authority, they ask the Court to read into the contract specific notice requirements that do not exist.  Plaintiffs identify no evidence that anyone ever requested that Great-West send notices to anyone other than Dr. Orchin after Dr. Gadaire effected an "absolute assignment" to the Trust, Dkt. 31-7 ¶ 18, and Great-West's failure to provide such additional notice of its own accord is not indicative of bad faith or a lack of fair dealing in carrying out the duties that it actually had.  *Cf.*, *e.g.*, *Paul v. Howard Univ.*, 754 A.2d 297, 311 (D.C. 2008). There is no basis to conclude that Great-West was "evad[ing] the spirit of the contract, willfully render[ing] imperfect performance, or interfer[ing] with performance by the other party."  *Id.* Thus, even if pled, Plaintiffs would be unable to proceed on an implied covenant theory.

The Court, therefore, concludes that Plaintiffs' claims that Great-West violated D.C. law and breached the insurance contract or any other agreement by terminating Dr. Gadaire's insurance 31 days after a missed payment fail as a matter of law.  Great-West is, accordingly, entitled to summary judgment on Count I ("Breach of Contract: D.C. Code § 31-4201"); Count III ("Breach of Contract: Duty to Maintain Contact with the Insured"); Count IV ("Breach of Contract: DCMR 26-A300 *et seq.*"); and Count V ("Breach of Contract: Duty to Provide Notices to Insured") of both amended complaints.  Dkt. 21 and Dkt. 26.

### 2. *The February 2010 Reinstatement Of Coverage*

Because the Court rejects Plaintiffs' contentions that the insurance was never validly terminated, the Court must next consider whether Great-West's subsequent decision to reinstate the coverage is enforceable. The parties do not dispute that at the time Great-West agreed to reinstate Dr. Gadaire's life insurance coverage, the company was unaware that Dr. Gadaire had died. Nor, with a few small exceptions, do the parties dispute the details of Orchin's communications with Great-West and the events that followed the reinstatement of Dr. Gadaire's insurance. Based on the largely undisputed facts, Great-West argues that the reinstatement of insurance is voidable under Illinois law because the insured loss occurred before the reinstatement and the insurance company was unaware of the loss, and that, in any event, Orchin fraudulently induced Great-West to reinstate the policy by misleading the company to believe that Dr. Gadaire was alive.

Under Illinois law, "[f]orfeiture of an insurance contract for nonpayment of premium is not favored in the law, and courts are prompt to seize upon circumstances which indicate a waiver of forfeiture" or lapse. *Van Hulle v. State Farm Mut. Auto Ins. Co.*, 254 N.E.2d 457, 461 (Ill. 1969). But, although Illinois courts are quick to impute knowledge of a loss to an insurance company and are prepared to find waiver of a lapse based on even modest indications of assent, some indicia of an insurance company's knowledge of an existing loss is required. The Illinois Supreme Court's decision in *Van Hulle* highlights how this line is drawn. In that case, an insured woman died in a car accident shortly after being informed that her insurance policy had lapsed but would be reinstated upon payment of a premium. *Id.* at 459. In the wreckage, her husband found an envelope with a signed check intended to reinstate the policy. Her insurance agent was informed of the loss and the already-signed check. *Id.* He explained that he could not

accept the check, but that the check could be mailed directly to the insurance company's office and that the company could decide whether to accept it.  *Id.*  The agent then informed the claims office of the situation, and the insurance company subsequently deposited the check.  The state Supreme Court concluded that the cashing of the check constituted a waiver of the lapse—but it repeatedly emphasized the importance of the insurance company's knowledge of the loss.  *See, e.g.*, *id.* at 460.  The Court wrote, for example, that "[t]o imply the waiver of lapse the insurer must have knowledge of the intervening loss," *id.* at 460, and that "to constitute waiver an intent to get retroactive coverage must be communicated to the insurer," *id.* at 461.  Relying on *Van Hulle*, other Illinois courts have both declined to find the waiver of a lapse where the insurance company lacked knowledge of the pre-existing loss, *see Kelly v. Econ. Fire & Cas. Co.*, 553 N.E.2d 412, 414-15 (Ill. App. Ct. 1990), and, although enforcing a policy, observed that "[i]n order to imply a waiver of lapse, the insurer must have knowledge of the intervening loss," *Horace Mann Ins. Co. v. Brown*, 300 N.E.2d 20, 23 (Ill. Ct. App. 1973).

This focus on the insurer's actual knowledge dates back to the Illinois Supreme Court's decision in *Miller v. Union Central Life Ins. Co.*, 110 Ill. 102 (1884).  There, an insurance agent accepted an overdue premium payment from a friend of the insured.  At the time, neither the friend nor the agent knew that the insured had already died.  The state Supreme Court concluded that the acceptance of the payment did not renew the insurance contract or "waive a forfeiture already accrued."  *Id.* at 107.  The Court explained that a "waiver presupposes knowledge of the right waived, and is not to be inferred from a purely negligent act, or one done under a misapprehension of the real condition of the rights of the parties at the time; and a renewal contract of insurance necessarily requires the continued existence of that which is insured."  *Id.*

Courts in other jurisdictions have taken similar approaches.  As the Court of Appeals for the Fourth Circuit observed in *Southern States Life Ins. Co. v. Matthews*, 205 F.2d 830, 832 (4th Cir. 1953), "[i]t is firmly established that the acceptance of overdue premiums on a life insurance policy after death of the insured does not constitute a waiver of the delinquency, if the insurer has no knowledge of the death, since in such case there could obviously be no intentional relinquishment of a known right."  *See also Dehart v. Aetna Life Ins. Co.*, No. 42932, 1982 WL 2473, at *5 (Ohio Ct. App.  July 15, 1982) ("[K]nowledge of an intervening loss of liability for payment has normally been held to be a prerequisite to waiver."); *O'Connor v. Metro. Life Ins. Co.*, 186 A. 618, 622 (Conn. 1936) ("The authorities generally agree that a waiver by reason of the receipt of overdue premiums does not arise where, at the time when that waiver is claimed to have occurred, the insured is dead but the insurer is ignorant of that fact.").

Here, there is no dispute that Great-West was unaware of Dr. Gadaire's death when it agreed to reinstate his insurance.  Indeed, the company discussed the possibility that Dr. Gadaire might be required to reapply for the insurance and only agreed to the waiver so that Dr. Gadaire could avoid the otherwise required medical exam.  *See* Dkt. 29-10 at 5; Dkt. 29-13 at 8.  At the same time, it also warned Orchin that this was a one-time exception—a warning that clearly contemplated ongoing coverage.  Dkt. 29-17 at 2.  Plaintiffs argue that the "knowledge" requirement applies only to cases involving implied waivers, and that the waiver here was express.  But the point of these cases is that an insurer's decision to reinstate insurance going forward does not equate to a decision to cover already-incurred losses.  Given this rationale, there is no reason to conclude that express reinstatements should be treated differently than implied reinstatements for these purposes.  The decision to insure a risk of possible loss in the future is of an entirely different nature than the decision to insure a loss that has already

occurred.  To paraphrase the Illinois Supreme Court, an insurance company cannot knowingly and intentionally relinquish a right to enforce a lapse in coverage—whether expressly or by implication—when it does not know that the insured loss has already occurred.

Plaintiffs also argue that the reinstatement should be enforced because Great-West knew that Dr. Gadaire was "uninsurable" for medical reasons when it reinstated the insurance.  Dkt. 39-2 at 19.  But there is a fundamental difference between agreeing to insure a living person whose health makes insurance riskier, and agreeing to insure the life of someone who is already deceased.  Even taking into account the flexible approach warranted in determining whether an insurer waived its right to deny coverage for losses incurred when the insurance had lapsed, the Court concludes that the reinstatement of insurance on Dr. Gadaire's life is unenforceable.  For this reason, Great-West is entitled to summary judgment as to Count II of both amended complaints, which is predicated on the failure to pay the policy proceeds after reinstatement.

Great-West further argues that even if the reinstatement was not voidable solely for lack of knowledge, Orchin fraudulently induced Great-West to reinstate the insurance coverage. Although the task of demonstrating entitlement to summary judgment on a claim or defense of fraud is a daunting one, Great-West has made a compelling case that Orchin's failure to disclose to Great-West that Dr. Gadaire had died might well satisfy this demanding standard.  Because the Court has already concluded that reinstatement was voidable because Great-West was unaware that the insured died before the insurance was reinstated, however, it is not necessary to reach this question.  The Court, accordingly, declines to decide whether Great-West has demonstrated that it is entitled to summary judgment on this alternative theory.

**B.  Mrs. Gadaire's Claims Against Orchin**

This leaves Mrs. Gadaire's claims, as beneficiary of the Trust, against Orchin for allowing the insurance to lapse.  She now seeks summary judgment on two of those three claims: Negligence (Count VI) and Breach of Fiduciary Duty (Count VIII).  As an initial matter, the Court notes that, unlike the claims arising out of the insurance contract, the parties do not dispute that these claims are governed by District of Columbia law.

In relevant respects, Mrs. Gadaire alleges that Orchin's failure to update his address of record with Great-West "caus[ed] him not to receive either the Premium Notice or the Lapse Notice" and eventually resulted in the non-payment of the insurance premiums.  Dkt. 30-1 at 11. Under District of Columbia law, a cause of action for negligence requires the existence of a duty of care owed by the defendant to the plaintiff and a breach of that duty that proximately causes harm to the plaintiff.  *Dist. of Columbia v. Harris*, 770 A.2d 82, 87 (D.C. 2001).  The applicable standard of care is "ordinary care under all of the circumstances," and "the amount of care owed a plaintiff by a particular defendant is 'a relative concept' that changes 'according to circumstances.'" *Sinai v. Polinger Co.*, 498 A.2d 520, 531 (D.C. 1985).  A cause of action for breach of fiduciary duty, in turn, requires that the defendant owed plaintiff a fiduciary duty; that the defendant breached that duty; and that the breach proximately caused harm to the plaintiff. *See 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 118-19 (D.D.C. 2012).  D.C. also has specific laws regulating the conduct of trustees, including D.C. Code § 19-1308.09, which provides that "[a] trustee shall take reasonable steps to take control of and protect the trust property," and D.C. Code § 19-1310.02(a), which provides that "[a] trustee who commits a breach of trust is liable to the beneficiaries [for] . . . the amount required to restore the value of the trust property."

Although a close question, the Court concludes that summary judgment is not warranted on the current record.  It is undisputed that Orchin did not update his address of record with Great-West but that he submitted forms to the post office to have his mail forwarded.  *See* Dkt. 37-10 at 58.  Beyond that, however, the record says little about the timing and circumstances of Orchin's moves, the care that he exercised as Trustee, whether it was reasonable for him to expect the insurance notices to make it to his new address, or whether it was reasonable for him to rely solely on the mail as a reminder to make payments.  Orchin contends that the Trust Agreement provides that he is not liable for "any action taken or not taken or for any loss of depreciation in the value of any property in the trust estate, whether due to an error of judgment or otherwise, where such Trustee has exercised *good faith and ordinary diligence* in the exercise of his duties."  Dkt. 29-4 at 14 (emphasis added).  He contends that he acted in good faith and with "ordinary diligence."  Although Mrs. Gadaire disputes this conclusion, she does not cite any authority that defines the contours of "ordinary diligence" as a matter of law—and not fact.  To the contrary, "determining the applicable standard of care is a question of fact for the jury." *Burke v. Scaggs*, 867 A.2d 213, 219 (D.C. 2005); *see also, e.g.*, *Nat'l R.R. Passenger Corp. v. McDavitt*, 804 A.2d 275, 285-86 (D.C. 2002) (question of applicable standard of care was "a subject amenable to common sense, to which the lay jurors . . . could apply their own experience in deciding how any reasonably prudent person would have acted under the circumstances.") (quotation marks omitted).

Orchin also raises a number of potential defenses.  He argues, for example, that Mrs. Gadaire failed to provide him with the money required for payments; did not notify him that she had not provided the necessary funds for two insurance periods; failed to "institute any sort of calendar system" to track her obligation to provide the funds; and failed to notify Great-West

that she was not receiving copies of premium notices.  Dkt. 37 at 11-12.  Although the undisputed evidence shows that, in the past, Orchin had notified Mrs. Gadaire when she should make payments into the Trust account to facilitate his payments to the insurer, Dkt. 29-5 at 8, Orchin apparently suggests that Mrs. Gadaire bore at least a portion of the responsibility for failing to notice that the insurance payments were not being made as required.  Relatedly, Orchin also argues that his only duties were those defined in the Trust Agreement and that, because the Trust Agreement imposed only a duty to pay premiums if the Trust's account had sufficient funds, he cannot be held liable for the failure to make payments.  *See* Dkt. 37 at 8-10.

In response to these defenses, Mrs. Gadaire contends that a beneficiary of a trust cannot be held contributorily negligent as a matter of law, relying on precedent from Colorado, New York, and Utah.  Dkt. 43 at 11.  At least some courts, however, have concluded that contributory negligence applies to actions for breach of fiduciary duty.  *See, e.g.*, *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 452 (S.D.N.Y. 2006) (discussing conflicting authorities under New York law).  This issue, however, was only raised in a single paragraph on the last page of Mrs. Gadaire's reply brief, Dkt. 43 at 11, and that paragraph does not address whether the District of Columbia follows or would adopt this rule.  Because the issue was raised in reply, moreover, Orchin has not had an opportunity to respond to the argument.  Accordingly, the Court is not prepared to resolve this legal issue at this time and will instead allow the parties an opportunity to raise it at a later stage.

Although the Court recognizes that Mrs. Gadaire's arguments have considerable force, at least on the present record and in light of the briefing to date, Mrs. Gadaire has failed to demonstrate that there is no issue of fact for the jury.  Accordingly, the Court will deny Mrs. Gadaire's motion for summary judgment.  This denial, however, is without prejudice to Mrs. Gadaire filing a renewed motion addressing (1) whether D.C. law permits a trustee to assert the

defense of contributory negligence against the trust's beneficiary, and (2) whether or in what circumstances a court can conclude as a matter of law that a defendant's conduct violated the applicable standard of care.

## IV.  CONCLUSION

For the reasons given above, Great-West's motion for summary judgment, Dkt. 31, is **GRANTED**; Orchin's motion for summary judgment, Dkt. 29, is **DENIED**, and Mrs. Gadaire's Motion for Summary Judgment, Dkt. 30, is **DENIED** without prejudice.


/s/ Randolph D. Moss
 RANDOLPH D. MOSS
United States District Judge

Date:  September 30, 2015